# United States Court of Appeals for the Federal Circuit

---

**GRAPEVINE IMPORTS, LTD., A TEXAS LIMITED PARTNERSHIP, T-TECH, INC., A TEXAS CORPORATION, AS TAX MATTERS PARTNER,**
*Plaintiffs-Appellees,*

v.

**UNITED STATES,**
*Defendant-Appellant.*

---

2008-5090

---

Appeal from the United States Court of Federal Claims in 05-CV-296, Judge Francis M. Allegra.

---

Decided: March 11, 2011

---

HOWARD R. RUBIN, Katten Muchin Rosenman, of Washington, DC, argued for plaintiffs-appellees. With him on the brief was ROBERT T. SMITH. Of counsel on the brief were M. TODD WELTY and LAURA L. GAVIOLI, Sonnenschein, Nath & Rosenthal, of Dallas, Texas; and KENNETH J. PFAEHLER, of Washington, DC. Of counsel was William E. Copley, Sonnenschein, Nath & Rosenthal, of Washington, DC.

GILBERT S. ROTHENBERG, Acting Deputy Assistant Attorney General, Appellate Section, Tax Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were JOHN A. DICICCO, Acting Assistant Attorney General, and MICHAEL J. HAUNGS and JOAN I. OPPENHEIMER, Attorneys.

ROGER J. JONES, Latham & Watkins LLP, of Chicago, Illinois, for amicus curiae Bausch & Lomb Incorporated. With him on the brief were ANDREW R. ROBERSON; and KIM M. BOYLAN, of Washington, DC.

---

Before LOURIE, BRYSON, and PROST, *Circuit Judges*.

PROST, *Circuit Judge*.

The government appeals the U.S. Court of Federal Claims' judgment that the Internal Revenue Service's ("IRS's") 2004 administrative adjustment of Plaintiffs' 1999 partnership return was time-barred. *Grapevine Imports, Ltd. v. United States*, 77 Fed. Cl. 505 (2007). The question is whether administrative adjustments in these circumstances are governed by the normal three-year statute of limitations, or whether they are controlled by a special six-year limitations period.

The Tax Code gives the IRS six years instead of three to adjust a return when the return "omits" some item that should have been included in "gross income." Here, the Plaintiffs are accused of overstating their basis in certain capital assets via a tax shelter, and thus understating income from those assets' sale. The government argues that basis overstatement is an "omission from gross income" sufficient to trigger the extended limitations period. Plaintiffs contend that it is not.

The Court of Federal Claims' judgment relied on the Supreme Court's opinion in *Colony, Inc. v. Commissioner of Internal Revenue*, 357 U.S. 28 (1958). In *Colony*, the Supreme Court reviewed the precursor limitations statute and held that overstatement of basis was not an "omission from gross income," and so did not trigger the extended limitations period. Following that precedent, the Court of Federal Claims granted judgment to Plaintiffs. In a separate case on similar facts, another panel of this court reached the same conclusion. *Salman Ranch Ltd. v. United States*, 573 F.3d 1362 (Fed. Cir. 2009).

In the months following, the U.S. Department of the Treasury issued new regulations disputing the reasoning applied by the Court of Federal Claims, stating that the *Colony* decision did not conclusively resolve the statute's interpretation, and holding that the limitations period—properly interpreted—gave the government six years to bring claims of this type.

Because we hold that the new Treasury regulations are entitled to deference in interpreting the statutory language, and because we hold that, under the regulations' interpretation, the government's case is not time-barred, we reverse the Court of Federal Claims' judgment.

## I. BACKGROUND

### A. Grapevine and the Tigues

This is a tax case. The story, for our purposes, begins in late 1999. Plaintiff Grapevine Imports, Ltd. ("Grapevine") was a limited liability partnership with three partners. Taxpayers Joseph J. Tigue and Virginia B. Tigue, limited partners, each owned 49.5% partnership shares. Plaintiff T-Tech, Inc. ("T-Tech") owned the re-

maining 1% as a general partner, and was also the partnership's tax matters partner. T-Tech, in turn, was wholly owned by Mr. Tigue.

The Tigues purportedly arranged to sell Grapevine (which owned an auto dealership) for upwards of $10 million. The government contends that the Tigues' collective tax basis in Grapevine at that time was about $1 million, so the sale would have resulted in significant taxable capital gains for the Tigues. From that starting point, a series of transactions took place that changed the tax picture significantly.

On December 9, 1999, the Tigues each sold short $5 million in U.S. Treasury Notes.[1] In a short sale, the seller sells some security that he does not actually own, normally by working with a lender to borrow securities at a set fee or rate for some period of time. The seller sells the borrowed securities; time passes. Then, just before he is due to return the securities to the lender, the seller buys equivalent securities using funds received from the earlier sale. He gives the equivalent securities to the lender, and the transaction is closed. *See Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3rd Cir. 1988) (describing short sales).

In this case, the initial phase of the Tigues' short sales brought in $9,978,119. Before the sales were closed, the Tigues conveyed these proceeds and the obligation to close the short sales to Grapevine.

---

[1] That the Tigues ran these transactions through two wholly-owned limited liability corporations—one for Joseph Tigue and one for Virginia Tigue—is not relevant to this short summary.

In order to close the sales, Grapevine purchased Treasury Notes on the open market having face value of $10,000,003. Grapevine then conveyed the notes to the lender, closing the short sale. Because Grapevine paid more for the Treasury Notes than it received from the Tigues, Grapevine recorded a $21,884 loss on the transaction.

Shortly thereafter, on December 31, 1999, the Tigues sold Grapevine for $11,017,146, and the proceeds were delivered to the Tigues and T-Tech according to their partnership interests.

Grapevine filed its 1999 partnership tax return on April 19, 2000, showing a net short-term loss of $21,884 (attributable to the short sale). On or about April 17, 2000, the Tigues filed a joint federal income tax return in which they reported a long term capital loss of $45,077 from their sale of Grapevine. The Tigues' return claimed a basis in Grapevine of $10,961,317.

The government contends that Grapevine and the Tigues' returns were improper. It contends that the Tigues' reported capital loss stemmed from an unlawful overstatement of the Tigues' basis in Grapevine. By treating the conveyance of the short sale proceeds (the $9,978,119) as increasing basis, but failing to apply a corresponding basis reduction to account for Grapevine's new obligation to close the short sales, the Tigues managed to dramatically increase their basis in the partnership—and so reduce their capital gains—via economically meaningless transactions. In other words, the government accuses the Tigues, through Grapevine, of using a "Son of BOSS ['Basis and Options Sales Strategy']" tax shelter. *See Kornman & Assocs. v. United States*, 527 F.3d 443, 446 n.2 (5th Cir. 2008) (describing "Son of

BOSS" tax shelters); I.R.S. Not. 2000-44, 2000-2 C.B. 255 (further describing such shelters, and identifying them as improper "listed transactions").

On December 17, 2004, the IRS issued a Final Partnership Administrative Adjustment ("FPAA") to T-Tech that administratively reduced the Tigues' basis in Grapevine by $10 million for 1999, thus requiring recomputation of the partners' tax liability.

### B.  Judgment of the Court of Federal Claims

Grapevine challenged the FPAA in the Court of Federal Claims as untimely.[2]  It argued that the Internal Revenue Code's statute of limitations for such adjustments was three years, and the IRS's adjustment was two years too late.  *See* I.R.C. § 6501(a) (2004) (setting forth a general rule that the IRS may not assess tax more than three years after the taxpayer's return); *id.* § 6229(a) (2004) (reflecting the three-year rule for tax attributable to partnership items).[3]  The government disagreed,

[2]  For convenience, the remainder of this opinion uses the term "Grapevine" to mean both Grapevine and its tax matters partner T-Tech.

[3]  In 2010, during this appeal's pendency, Congress made certain amendments to the Tax Code's limitations statutes.  Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, § 513, 124 Stat. 71, 111 (2010). Congress stated that these amendments would affect returns for which the limitations period had not yet expired on the date of enactment, March 18, 2010, but noted that such limitations period was to be computed based on the pre-amendment statute.  *Id.* § 513(d), 124 Stat. at 112.  In this opinion, we therefore analyze the 2004 code to determine the limitations period for Grapevine's 1999 return.  We make no holding as to the effect, if any, of the substantive amendments on Grapevine's case.

contending that Grapevine's overstatement of basis—
which led to understatement of gain, and so underpay-
ment of tax—triggered an extended six-year statue of
limitations. *See* I.R.C. §§ 6501(e)(1)(A), 6229(c)(2) (2004).

The Court of Federal Claims sided with Grapevine
and ruled the government's attempt at adjustment time-
barred. The court noted that the Supreme Court had
analyzed the question of whether overstatement of basis
would lead to an extended limitations period under the
precursor statute. *See Colony, Inc. v. Comm'r of Internal
Revenue*, 357 U.S. 28, 32–38 (1958).

*Colony* was a fairly straightforward statutory inter-
pretation case. The taxpayer was a corporation in the
business of land sales. *See Colony, Inc. v. Comm'r of
Internal Revenue*, 26 T.C. 30, 31 (1956), *rev'd*, 357 U.S. 28
(1958). The corporation's 1946 and '47 tax returns over-
stated basis in certain land sales, and so understated the
corporation's profits. The question was whether the IRS
could assess deficiencies on those returns more than three
but less than five years later (the extended limitations
period was then five years). *Colony*, 357 U.S. at 30.

The limitations statute interpreted in *Colony* resem-
bled the law at issue here:

SEC. 275. PERIOD OF LIMITATION UPON
ASSESSMENT AND COLLECTION.

Except as provided in section 276—

---

We note, however, that neither Grapevine nor the gov-
ernment contends that these amendments should affect
this appeal.

(a) General Rule.—The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

. . .

(c) Omission from Gross Income.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.

Internal Revenue Code of 1939 § 275, 53 Stat. 1, 86–87 (1939).

In determining whether the phrase "omits from gross income" encompasses an overstated basis, the Supreme Court noted, "[I]t cannot be said that the language is unambiguous.  In these circumstances we turn to the legislative history of § 275(c)." *Colony*, 357 U.S. at 33.

Turning to that history, *Colony* found in the legislative reports a number of statements indicating that "Congress merely had in mind failures to report particular income receipts and accruals, and did not intend the five-year limitation to apply whenever gross income was understated." *Id.* at 35.  The Court concluded that the

purpose of the extended limitations period was to give the government extra time to discover items that had been entirely omitted from returns—not to recover for items that, though included, were misstated. *Id.* at 36. On that basis, the Court held for the taxpayer and ruled that overstatement of basis was not an "omission from gross income."

Returning to this case's time before the Court of Federal Claims, Grapevine argued that *Colony* controlled, and the government's case was time-barred. The government tried to resist *Colony*'s application. It argued that *Colony* properly applied only to income from the sale of goods and services by a trade or business, and not other income.[4] The basis of this argument was that the modern Tax Code differs from the statute analyzed in *Colony*. Notably, the updated code sets forth a test similar to that in *Colony*—but explicitly limits that test to the "trade or business" context. I.R.C. § 6501(e)(1)(A)(i) (2004).

The government argued that *Colony* should be similarly limited to the "trade or business" context. It urged that this was Congress's intent, and pointed out that the taxpayer in *Colony* was in the business of land sales. The Court of Federal Claims disagreed, noting several reasons why *Colony* still controlled even outside the "trade or business" context. *See Grapevine*, 77 Fed. Cl. at 510–12. The court also noted that the Supreme Court had discussed—briefly—§ 6501(e)(1)(A) in the *Colony* opinion:

> And without doing more than noting the speculative debate between the parties as to whether Congress manifested an intention to clarify or to

---

4    This argument had achieved some traction in certain judicial decisions. *See Grapevine*, 77 Fed. Cl. at 509–10 (recounting decisions questioning *Colony*'s reach).

> change the 1939 Code, we observe that the con-
> clusion we reach is in harmony with the unambi-
> guous language of § 6501(e)(1)(A) of the Internal
> Revenue Code of 1954.

*Colony*, 357 U.S. at 37. The 1954 revision to § 6501(e)(1)(A) brought the language to essentially its modern posture. Consistent with the Supreme Court's note, the Court of Federal Claims went on to determine that Congress's enactment of § 6501(e)(1)(A) did not operate to limit *Colony*'s holding.

Accordingly, on April 23, 2008, the court entered judgment dismissing the government's claims concerning the 1999 tax return as time-barred. The government timely appealed.

### C. *Salman Ranch* and the New Regulations

Before briefing began, Grapevine moved to consolidate this appeal with another Son of BOSS case then pending before another panel, *Salman Ranch Ltd. v. United States*, 573 F.3d 1362 (Fed. Cir. 2009). The government opposed consolidation, but asked for this case to be held in abeyance until the *Salman Ranch* case was decided on the possibility that *Salman Ranch* would conclusively resolve the time bar question. We agreed with the government and stayed briefing in this case.

The *Salman Ranch* opinion ably sets forth that case's progress before the court. Briefly put, the government again argued that the *Colony* decision should be limited to the context of income from the sale of goods or services by a trade or business. *Id.* at 1371. The *Salman Ranch* panel disagreed. It concluded that the *Colony* decision did not turn on the taxpayer's trade or business, and that

enactment of § 6501(e)(1)(A) did not mandate any different result. *Id.* at 1373–77. Thus, the panel held for the taxpayer and ruled the government's claims time-barred.

Shortly after *Salman Ranch* issued, the Treasury Department issued temporary regulations implementing the Department's own interpretation of the statute of limitations and the statute's interaction with *Colony*. Treas. Regs. §§ 301.6229(c)(2)-1T, .6501(e)-1T, 74 Fed. Reg. 49,321 (Sept. 28, 2009). The Department subsequently issued final regulations replacing the temporary regulations. Treas. Regs. §§ 301.6229(c)(2)-1, .6501(e)-1, 75 Fed. Reg. 78,897 (Dec. 17, 2010).

The preamble to the final regulations states: "The Treasury Department and the Internal Revenue Service disagree . . . that the Supreme Court's reading of the predecessor to section 6501(e) in *Colony* applies to sections 6501(e)(1) and 6229(c)(2) . . . ." 75 Fed. Reg. at 78,897. The regulations go on to set forth the Department's view that, outside the context of income from sale of goods or services by a trade or business, "an understatement of gross income resulting from an overstatement of unrecovered cost or other basis constitutes an omission from gross income for purposes of 6501(e)(1)(A)." Treas. Reg. § 301.6229(c)(2)-1(a)(1)(iii) (2010); *see also* Treas. Reg. § 301.6501(e)-1(a)(1) (2010). In other words, the new Treasury regulations set forth the view of *Colony* that the government urged before both the Court of Federal Claims in this case, and before the *Salman Ranch* panel. They state that *Colony* did not conclusively resolve the statutory interpretation issue, and that overstatement of basis (outside the trade or business context) can trigger the extended limitations period.

The government contends that the new Treasury regulations should control the outcome of the present appeal. Grapevine resists, arguing that the new regulations cannot change this court's interpretation of the limitations statutes, and, even if they can, they do not apply in this case.

## II. DISCUSSION

### A. Standard of Review

We have jurisdiction over this appeal from the Court of Federal Claims' final judgment pursuant to 28 U.S.C. § 1295(a)(3). We review that court's grant of summary judgment de novo. *Pennzoil-Quaker State Co. v. United States*, 511 F.3d 1365, 1369 (Fed. Cir. 2008). Summary judgment is appropriate where "there is no genuine issue as to any material fact and [the movant] is entitled to judgment as a matter of law." R. Ct. Fed. Cl. 56(c)(1).

In this case, the underlying facts are not in dispute. Our role is to resolve a question of pure statutory interpretation. This is an issue of law, which we review de novo. *AD Global Fund, LLC v. United States*, 481 F.3d 1351, 1353 (Fed. Cir. 2007).

### B. Presence of Intervening Authority

The essential issue on appeal is whether this case is governed by our decision in *Salman Ranch*. A panel of this court is ordinarily bound to follow a prior precedential decision unless there are intervening circumstances, such as new controlling authority. *Tex. Am. Oil Corp. v. Dep't of Energy*, 44 F.3d 1557, 1561 (Fed. Cir. 1995) (en banc) ("This court applies the rule that earlier decisions prevail unless overruled by the court *en banc*, or by other

controlling authority such as intervening statutory change or Supreme Court decision.").

The new Treasury regulations cannot, of course, change the Tax Code. But they may reflect the Treasury Department's exercise of authority granted by Congress to interpret an ambiguity in that code. Where an executive department, entrusted with interpretive authority, promulgates statutory interpretations that are reasonable within the circumstances established by Congress, then the courts must defer to that interpretation. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984).

There is at this point little doubt that the Treasury Department has a Congressional mandate to interpret ambiguities in the Tax Code, and that Treasury regulations, when promulgated, are to be interpreted under the standards set forth in *Chevron*. *Mayo Found. for Med. Educ. & Research v. United States*, No. 09-837, slip op. at 11–12, 562 U.S. ___ (Jan. 11, 2011); *see also Mead v. United States*, 533 U.S. 218, 229 (2001). Our task, therefore, is to examine the statute and the regulations to determine the deference, if any, owed to the Treasury Department in this appeal. In other words, we undertake *Chevron* review of the new Treasury regulations. If the Treasury regulations are entitled to *Chevron* deference, then they are new intervening authority and may require us to depart from *Salman Ranch*.

## C.  Applying *Chevron*

The *Chevron* analysis has two steps. First, we must determine if there is an ambiguity in the statute such that an agency has room to interpret. Second, we must determine whether the agency's action is a reasonable

interpretation of Congress's intent. *Chevron*, 467 U.S. at 842–43.

### 1. *Chevron* Step One: Congress's Intent Was Not So Clear as to Foreclose Reinterpretation

Where a court, applying the traditional tools of statutory construction, is unable to identify a "clear intent" by Congress as to how a given question should be resolved, that opens the door to an agency filling in the "gap" by regulation. *Chevron*, 467 U.S. at 843. The search for Congress's intent begins with the plain statutory text. *Id.* at 848–51; *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.* (hereinafter "*Brand X*"), 545 U.S. 967, 986 (2005) ("At the first step, we ask whether the statute's plain terms directly address the precise question at issue.") (quotation marks omitted); *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed. Cir. 1996). If, even after consulting the plain text, there is still some question as to Congress's intent concerning the given question, we turn to the traditional tools of statutory construction, e.g., legislative history, to see if they show a clear intent that is unclear from the text alone. *Chevron*, 467 U.S. at 842–43; *see also Torrington*, 82 F.3d at 1044.

The Tax Code's provision for an extended limitations period when a return reflects a "[s]ubstantial omission of items" reads:

> (e) Substantial omission of items.—Except as otherwise provided in subsection (c)—
>   (1) Income taxes.—In the case of any tax imposed by subtitle A—
>     (A) General rule.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of

the amount of gross income stated in the re-
turn, the tax may be assessed, or a proceed-
ing in court for the collection of such tax
may be begun without assessment, at any
time within 6 years after the return was
filed.  For purposes of this subparagraph—

(i) In the case of a trade or business, the
term "gross income" means the total of the
amounts received or accrued from the sale
of goods or services (if such amounts are
required to be shown on the return) prior
to diminution by the cost of such sales or
services; and

(ii) In determining the amount omitted
from gross income, there shall not be
taken into account any amount which is
omitted from gross income stated in the
return if such amount is disclosed in the
return, or in a statement attached to the
return, in a manner adequate to apprise
the Secretary of the nature and amount of
such item.

I.R.C. § 6501(e)(1)(A) (2004).

The Tax Code includes similar language clarifying
that, where the "substantial omission of income" is attrib-
utable to a partnership item, the limitations period for the
taxpayer should not expire before six years after the
relevant date for the partnership return:

(a) General rule.—Except as otherwise provided in
this section, the period for assessing any tax im-
posed by subtitle A with respect to any person
which is attributable to any partnership item (or
affected item) for a partnership taxable year shall

not expire before the date which is 3 years after the later of—
> (1) the date on which the partnership return for such taxable year was filed, or
> (2) the last day for filing such return for such year (determined without regard to extensions).
>
> . . .
>
> (c) Special rule in case of fraud, etc.—
>
> . . .
>
> (2) Substantial omission of income.—If any partnership omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in its return, subsection (a) shall be applied by substituting "6 years" for "3 years".

*Id.* § 6229(a)–(c)(2) (2004).

Grapevine contends that, under *Colony* and *Salman Ranch*, these statutes' meaning is clear: overstatement of basis does not constitute an "omission from gross income." The government disagrees and argues that those cases do not control this one. We think the government is correct. Those cases, while instructive, do not resolve the question for purposes of *Chevron* step one.

Both *Colony* and *Salman Ranch* preceded the issuance of Treasury regulations interpreting this statute. The task of those courts was therefore different from ours. Their task was to weigh the evidence of the statute's meaning and to determine whether that evidence better favored the taxpayer or the government. The goal was to find the best (in each court's view) interpretation of the

statute in light of the evidence.  And in that inquiry, both reached the same outcome—they held the taxpayers' arguments against including overstated basis as an "omission" stronger than the government's argument in favor, and interpreted the statute accordingly.

We face a different task in light of *Chevron* and *Brand X*.  The objective of *Chevron* step one is not to interpret and apply the statute to resolve a claim, but to determine whether Congress's intent in enacting it was so clear as to foreclose any other interpretation.  *See Brand X*, 545 U.S. at 982–83 ("Only a judicial precedent holding that the statute unambiguously forecloses the agency's interpretation, and therefore contains no gap for the agency to fill, displaces a conflicting agency construction.").  If room exists for more than one reasonable interpretation of Congress's intent, then the agency, not the judiciary, has the interpretive mandate.  The courts' role is thereby reduced to ensuring that the agency takes no action that is unreasonably inconsistent with the statute.  *Id.*; *see also Chevron*, 467 U.S. at 843–44.

Looking at the relevant text of § 6229 and § 6501, we find them ambiguous as to Congress's intent concerning treatment of a taxpayer's overstated basis.  *Chevron*, 467 U.S. at 842–43; *see also Brand X*, 545 U.S. at 986.  This is consistent with the analysis of both *Colony* and *Salman Ranch*.  In *Colony*, as noted *supra*, the Supreme Court expressly found the predecessor statute ambiguous, and turned to the legislative history to resolve the question.  357 U.S. at 33 ("[I]t cannot be said that the language [of the statute] is unambiguous.").  And while it is true that the Court later referred to the updated § 6501(e)(1)(A) as "unambiguous," it did not rely or elaborate on that statement, nor was the updated statute at issue in that case.  *Id.* at 37.  Further, in *Colony* the taxpayer was in the

business of land sales, so § 6501(e)(1)(A)(i)'s test for income "in the case of a trade or business" expressly applied. That is not the case here. The ambiguity concerns what to do outside the trade and business context, and the only language in § 6501(e)(1)(A) applicable outside the trade or business context is the same language from the predecessor statute, "omits from gross income an amount." The Supreme Court previously noted that this term was ambiguous as to whether it encompassed an overstated basis. We therefore find *Colony* no bar to our finding that the text of the relevant statutes, standing alone, is ambiguous as to the disposition of this issue.[5]

Nor does *Salman Ranch* mandate any different conclusion. This court there closely analyzed both the updated statute and its legislative history to determine whether divergence from *Colony* was warranted. 573 F.3d at 1373–77. It made no separate holding that the statute was unambiguous for purposes of *Chevron* step one, and indeed the panel's resort to legislative history strongly suggests that the statutory interpretation could not be resolved on the statutory text alone.

---

[5] In recent months, several of our sister circuit courts have addressed this issue and reached varying results. *Compare Burks v. United States*, No. 09-11061, slip op. at 21–22 (5th Cir. Feb. 9, 2011) (declining to grant *Chevron* deference because statute was unambiguous), *and Home Concrete & Supply, LLC v. United States*, No. 09-2353, slip op. at 13–14 (4th Cir. Feb. 7, 2011) (same), *with Beard v. Comm'r of Internal Revenue*, No. 09-3741, slip op. at 12 (7th Cir. Jan. 26, 2011) (holding *Colony* non-controlling in light of intervening statutory change and noting appropriateness of *Chevron* deference); *see also Bakersfield Energy Partners v. Comm'r of Internal Revenue*, 568 F.3d 767, 775–78 (9th Cir. 2009) (holding, prior to promulgation of regulations, that *Colony* controlled interpretation of limitations period).

We thus conclude that the plain statutory text of § 6501(e)(1)(A) and § 6229(c)(2), standing alone, is subject to multiple interpretations. As this court noted in *Salman Ranch*, the Tax Code's use of the term "omits" suggests that the section is primarily addressed to the return where the taxpayer has "fail[ed] to include or mention" or "le[ft] out" some item rather than misrepresenting it (as by an overstatement of basis). 573 F.3d at 1374 (quoting *Am. Heritage Dictionary of the English Language* 1227 (4th ed. 2000)). But without looking beyond the text itself, we cannot say that the statute forecloses the possibility that a taxpayer's overstated basis might constitute an omission from gross income.

Having concluded that the text, standing alone, does not resolve Congress's intended treatment of basis overstatement, we next must look to see if there are any other indications of Congressional intent so clear that we perceive no room for an agency to add anything. "If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43; *Brand X*, 545 U.S. at 986.

Even incorporating the legislative history into our analysis of the statutory text, we do not think Congress's intent was so clear that no reasonable interpretation could differ. *Colony* reviewed much of the relevant Congressional debate and committee reports for the 1934 Revenue Act. 357 U.S. at 33–35. Of the excerpts analyzed by the Supreme Court, none explicitly discussed application of the limitations period to cases involving overstatement of basis. The cited excerpts discuss the situation of taxpayers who, whether "negligent," "forgetful," or "by honest mistake," omit—not overstate the basis of—items on their return. *Id.* The Court found these

excerpts "persuasive" to support its holding. *Id.* at 35. The Court did not find that there was no other reasonable interpretation of the history than its own, and neither do we.

*Salman Ranch*'s review of the more recent legislative history of § 6501 also cannot resolve the issue beyond question. 573 F.3d at 1375–76. This court concluded from the legislative history that Congress's 1954 amendments were primarily directed to the related issue of whether omitted gross income exceeded 25% of stated gross income, not whether basis overstatement was an omission. *Id.* at 1376. While persuasive support of *Salman Ranch*'s holding, the cited text cannot remove all reasonable dispute about Congress's meaning.

Accepting the soundness of the judicial reasoning in *Colony* and *Salman Ranch*, it is not judicial clarity that matters for step one of *Chevron*, but legislative clarity. If the Tax Code lacks legislative clarity, and we hold that it does, then there is room for agency interpretation. That the Supreme Court and this court have strongly reasoned for a certain interpretation of these statutes does not mean their inherent ambiguity has been wiped away. *Brand X*, 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from *the unambiguous terms of the statute* and thus leaves no room for agency discretion.") (emphasis added).

We conclude that § 6501(e)(1)(A) and § 6229(c) are ambiguous as to Congress's intent for treatment of basis overstatement outside the trade or business context. We therefore conclude that the Treasury Department is entitled to promulgate its own interpretation of these

statutes, and to have that interpretation given deference by the courts so long as it is within the bounds of reason.

### 2. *Chevron* Step Two: The Treasury Regulations Are a Reasonable Interpretation of the Limitations Period

The second step of the *Chevron* analysis asks whether the newly issued Treasury regulations constitute "a reasonable policy choice for the agency to make." *Chevron*, 467 U.S. at 845. Review of the Treasury regulations reveals that they are reasonable, even though they depart from the judicial interpretation of *Colony* and *Salman Ranch*.

As it did before this court in *Salman Ranch*, the Treasury Department justified its statutory interpretation with two basic arguments. First, the Department viewed Congress's addition of a special "gross receipts" definition in the 1954 Internal Revenue Code as a response to "disagreement among the courts that existed at the time regarding the proper scope of section 275(c) of the 1939 Internal Revenue Code." Preamble to Temp. Treas. Regs., 74 Fed. Reg. 49,321 (Sept. 28, 2009); *see also* Preamble to Treas. Regs., 75 Fed. Reg. 78,897 (Dec. 17, 2010) (adopting the reasons set forth in the preamble to the temporary regulations). By emphasizing the effect of the "gross receipts" definition, the regulations purport to better reflect Congress's intention when compared to *Colony*. Second, the Department argues that to apply *Colony* outside the trade or business context risks rendering the "gross receipts" definition meaningless. It asks, why would Congress enact a new definition for "gross receipts" in the trade or business context if it had already established (as *Colony* held) that that same definition would apply in *all* contexts? Preamble to Temp. Treas. Regs., 74 Fed. Reg. at 49,321–22.

*Salman Ranch* discussed these justifications and found them non-persuasive, 573 F.3d at 1374–76, but we are unable to say that they, or the policy they support, are ipso facto unreasonable. It is beyond question that in 1954 Congress added provisions for computing gross income in the trade and business context without expressly stating whether those provisions would also apply to other contexts. One could, and in this case the Treasury Department did, reasonably argue that this was evidence of an intent to treat non-trade or business income according to a different rule.

Grapevine opposes this conclusion, reasoning first that an interpretation that departs from *Colony* cannot be reasonable. Appellees' Br. 42–43. For the reasons already set forth, we disagree. *Colony*'s holding does not foreclose reasonable disagreement in agency rules under *Chevron*. Neither that case nor *Salman Ranch* found Congress's intent was so clear as to support no reasonable interpretation other than the taxpayer's.

In its response brief, Grapevine also argues that the temporary Treasury regulations should not receive *Chevron* deference because of purported procedural shortcomings in their issuance. Now that the regulations have issued in final form, these arguments are moot. There can be little doubt that the final regulations of the Treasury Department are entitled to *Chevron* review and, where appropriate, deference. *Mayo Found.*, slip op. at 9–10 ("We believe *Chevron* and *Mead*, rather than *National Muffler* and *Rowan*, provide the appropriate framework for evaluating the full-time employee rule [a Treasury regulation promulgated after notice-and-comment procedures]."); *United States v. Cleveland Indians Baseball Co.*, 532 U.S. 200, 219 (2001); *cf. Fed. Nat'l Mortg. Ass'n v. United States*, 379 F.3d 1303, 1307–08 (Fed. Cir. 2004).

Because the Treasury regulations are a reasonable interpretation of § 6501(e)(1)(A), they must receive our deference. *Chevron* and *Salman Ranch* notwithstanding, we will defer to the Treasury Department's interpretation in applying § 6501(e)(1)(A).

## D.  The Present Appeal

Grapevine contends that, even if the Treasury regulations control application of the limitations period prospectively, they should not control the present appeal. Grapevine presents three arguments, which we address in turn.

### 1.  The New Treasury Regulations Apply to Previous Tax Years

Grapevine first contends that even if the new regulations control assessments for future tax years, they do not meet the legal requirements for retroactive application to 1999 tax assessments.

The Tax Code empowers the Treasury Department to promulgate retroactive regulations:

> (b) Retroactivity of regulations or rulings.—The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect.

I.R.C. § 7805(b) (1995); *see also Redhouse v. Comm'r of Internal Revenue*, 728 F.2d 1249, 1250–51 (Fed. Cir. 1984).[6]

Grapevine claims that there is a "strong presumption against" retroactive application of certain statutes and regulations, citing Supreme Court cases from the non-tax context as support. Appellees' Br. 22–26; *see also Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994); *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988). Grapevine urges us to undertake the various tests set forth in those cases to review the Tax Code and the new regulations, presumably out of due process and fairness concerns.

The government, on the other hand, points out that the Supreme Court has long upheld the retroactivity of tax legislation. *See, e.g.*, *United States v. Carlton*, 512 U.S. 26, 30 (1994) ("This Court repeatedly has upheld retroactive tax legislation against a due process challenge."). Moreover, the Supreme Court specifically endorsed the Treasury Department's power to apply rules and regulations retroactively under § 7805(b), on an "abuse of discretion" standard:

[I]t is clear from the language of the section [precursor to § 7805(b)] and its legislative history that Congress thereby confirmed the authority of the Commissioner to correct any ruling, regulation or Treasury decision retroactively[.]

---

[6] The present statute places more extensive limits on retroactivity. I.R.C. § 7805(b). But there is no dispute that those limits do not apply to regulations concerning pre-1996 statutory enactments. Taxpayer Bill of Rights 2, Pub. L. No. 104-168, § 1101(b), 110 Stat. 1452, 1469 (1996). The statutory sections at issue here are in that category.

*Auto. Club of Mich. v. Comm'r of Internal Rev.*, 353 U.S. 180, 184 (1957) (footnote omitted); *see also id.* at 187 (applying abuse of discretion standard); *Redhouse*, 728 F.2d at 1251 (applying abuse of discretion standard to retroactive rule). Further, we read *Landgraf* as emphasizing a requirement of clear Congressional intent for retroactive application. 511 U.S. at 266 ("[A] requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness.") Such an intent was manifest here, by § 7805(b)'s straightforward endorsement of retroactive regulation.

We therefore must determine whether it was an abuse of discretion for the Treasury Department to state that the new regulations would apply to preceding tax years. We conclude that it was not. As we have already set forth above, the new regulations are a reasonable interpretation of the limitations statutes. By their terms, the new regulations will apply only to those taxpayers who are within the limitations period as computed under the new regulation, so there is no opportunity for these regulations to reach into the distant past. And while we recognize that some taxpayers whose past returns bear evidence of overstated basis may find themselves facing adjustments when they thought the limitations period had lapsed, we cannot say that the burden on those taxpayers is so great as to be an abuse of the Treasury Department's discretion. We therefore conclude that the new regulations may properly be applied to returns from past tax years whose limitations periods (as recomputed) has not yet expired.

## 2. The Period for Assessing Grapevine's 1999 Return Remains Open until the Close of Litigation

Grapevine next argues that the Treasury regulations, by their terms, do not apply to its 1999 return because the regulations "appl[y] to taxable years with respect to which the period for assessing tax was open on or after September 24, 2009." Treas. Regs. §§ 301.6229(c)(2)-1(b), 301.6501(e)-1(e). Grapevine urges that the period for assessing Grapevine's tax closed on April 19, 2003, pursuant to the judgment of the Court of Federal Claims and this court's subsequent decision in *Salman Ranch*. Grapevine repeatedly describes the Court of Federal Claims' decision as a "final judgment," and contends that it is not within the Treasury Department's power to contravene such a judgment.

The government responds that the Tax Code expressly extends the period of assessment being litigated "until the decision of the court becomes final." I.R.C. § 6229(d) (2004). "Final," according to the government, means for tax assessment purposes that all appeals have been exhausted. *Id.* § 7481 (stating that a decision of the Tax Court becomes final only after appeals have been exhausted).

The government further notes that the preamble to the final regulations makes clear that the regulations will apply to entities in Grapevine's position:

> [T]he final regulations apply to taxable years with respect to which the six-year period for assessing tax under section 6229(c)(2) or 6501(e)(1) was open on or after September 24, 2009. This includes, but is not limited to, all taxable years (1) for which six years had not elapsed from the later

of the date that a tax return was due or actually filed, *(2) that are the subject of any case pending before any court of competent jurisdiction (including the United States Tax Court and Court of Federal Claims) in which a decision had not become final (within the meaning of section 7481)* or (3) with respect to which the liability at issue had not become fixed pursuant to a closing agreement entered into under section 7121.

Preamble to Treas. Regs. §§ 301.6229(c)(2)-1, 301.6501(e)-1, 75 Fed. Reg. at 78,898 (emphasis added). The emphasized clause, concerning pending litigation, is at issue here.

Where, as here, a tax matters partner petitions a court for readjustment of partnership items, the Tax Code states that the limitations period is tolled "until the decision of the court becomes final." *Id.* § 6229(d)(1) (2004). In such a case, the term "final" has the meaning set forth in § 7481—that is, a decision is not "final" until it is beyond further appeal. And although § 7481 speaks in terms of a "Tax Court" decision not becoming final until opportunities for appeal are exhausted, the Code is clear that the same test applies where a partnership sues in the Court of Federal Claims. I.R.C. § 6230(g) ("For purposes of section 6229(d)(1) and section 6230(c)(2)(B), the principles of section 7481(a) shall be applied in determining the date on which a decision of a district court or the Court of Federal Claims becomes final.").

Grapevine argues that decisions of the Court of Federal Claims are different from those of the Tax Court: the Tax Court's decisions become "final" when appellate review is exhausted, but the Court of Federal Claims' decisions are final when entered. As shown above, the

Tax Code clearly provides otherwise. We therefore hold that the limitations period for Grapevine's 1999 tax return remains open until this case reaches unappealable termination. It is open today, and it was open on September 24, 2009. As a result, by their plain terms the new Treasury regulations apply to Grapevine's 1999 return.

### 3.  It is Not Improper to Apply the New Treasury Regulations to Grapevine

Finally, Grapevine argues that the government is trying to change the rules in the middle of the game. Having failed to prevail at the Court of Federal Claims, and having had the limitations period construed against it by this court in *Salman Ranch*, Grapevine argues that the Treasury Department should not be permitted to transform a lower court loss into an appellate win via new regulations.

While we understand Grapevine's disappointment, we disagree that this is an improper outcome. This case highlights the extent of the Treasury Department's authority over the Tax Code. As *Chevron* and *Brand X* illustrate, Congress has the power to give regulatory agencies, not the courts, primary responsibility to interpret ambiguous statutory provisions. That is what happened here. That the Treasury Department had not exercised its interpretive authority over the relevant language until after the Court of Federal Claims granted summary judgment does not diminish the Department's authority, nor its right to have its interpretations, when promulgated, respected by the judiciary—so long as they are reasonable.

Further, the Supreme Court and this court have specifically affirmed the judiciary's obligation to defer to agency interpretations even when those regulations come midstream in litigation. *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 741 (1996) ("Nor does it matter that the regulation was prompted by litigation, including this very suit. . . . That it was litigation which disclosed the need for the regulation is irrelevant."); *see also United States v. Morton*, 467 U.S. 822, 836 n.21 (1984); *Motorola, Inc. v. United States*, 436 F.3d 1357, 1366 (Fed. Cir. 2006) ("It makes no difference to our analysis that the regulation was promulgated in 2002, after the controversy arose and after this litigation began."). Agencies retain this authority even if they are parties to the litigation in which new regulations are asserted as authority. *See Morton*, 467 U.S. at 836 n.21.

E. Application of the New Regulations to Grapevine

We therefore conclude that the Treasury Regulations are new controlling authority that may change the Court of Federal Claims' judgment. Because there are no questions of material fact, our last task is to determine whether either Grapevine or the government is entitled to summary judgment as to the FPAA's timeliness.

The Regulations state that the term "gross income," as used in the limitations statutes, has two possible meanings depending on whether the income in question is "from the sale of goods or services in a trade or business." Treas. Regs. §§ 301.6229(c)(2)-1 (a)(1)(ii)–(iii), 301.6501(e)-1 (a)(1)(ii)–(iii). Here, the understatement of income stemmed from the sale of the partnership, not a sale of goods or services in a trade or business, so the latter definition applies:

(iii) For purposes of paragraph (a)(1)(i) of this section, the term gross income, as it relates to any income other than from the sale of goods or services in a trade or business, has the same meaning as provided under section 61(a), and includes the total of the amounts received or accrued, to the extent required to be shown on the return. In the case of amounts received or accrued that relate to the disposition of property, and except as provided in paragraph (a)(1)(ii) of this section, gross income means the excess of the amount realized from the disposition of the property over the unrecovered cost or other basis of the property. Consequently, except as provided in paragraph (a)(1)(ii) of this section, an understated amount of gross income resulting from an overstatement of unrecovered cost or other basis constitutes an omission from gross income for purposes of section 6229(c)(2).

Treas. Reg. § 301.6229(c)(2)-1 (a)(1)(iii); *see also id.* § 301.6501(e)-1 (a)(1)(iii) (stating same with respect to I.R.C. § 6501(e)(1)(A)(i)).

The regulation's effect is straightforward. It makes clear that Grapevine and the Tigues' overstatement of basis "constitutes an omission from gross income" for purposes of the limitations statutes. Applying that rule, we conclude that Grapevine and the Tigues' overstatement of basis triggered the extended limitations periods of § 6229(c)(2) and § 6501(e)(1)(A).

### III. CONCLUSION

When the Court of Federal Claims entered judgment for Grapevine, the Treasury Department had not yet

exercised its interpretive authority over the limitations periods at issue in this case. It now has, and we, like the Court of Federal Claims, are obliged to defer to that interpretation.  We therefore reverse the entry of judgment for Grapevine and remand for further proceedings.

**REVERSED AND REMANDED**