**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 31, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

# UNITED STATES COURT OF APPEALS

# TENTH CIRCUIT

---

SALMAN RANCH, LTD.; FRANCES
KOENIG, Tax Matters Partner,

     Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE,

     Respondent-Appellant.

No. 09-9015

---

BAUSCH & LOMB INCORPORATED,

     Amicus Curiae.

---

**On Appeal From The**
**United States Tax Court**
**(Docket No. 13677-08)**

---

Gilbert S. Rothenberg, Acting Deputy Assistant Attorney General (John A.
DiCicco, Acting Assistant Attorney General; and Michael J. Haungs and Joan I.
Oppenheimer, Attorneys, Tax Division, Department of Justice, with him on the
briefs), Washington, D.C., for Respondent-Appellant.

Alan Poe (Adam M. Cohen with him on the brief) of Holland & Hart LLP,
Greenwood Village, Colorado, for Petitioners-Appellees.

Roger J. Jones of Latham & Watkins LLP, Chicago, Illinois, and Kim Marie
Boylan of Latham & Watkins LLP, Washington, D.C., filed a brief for Amicus
Curiae Bausch & Lomb Incorporated.

Before **LUCERO**, **SEYMOUR,** and **TACHA**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

The Commissioner of the Internal Revenue Service appeals a decision of the Tax Court granting summary judgment in favor of Salman Ranch, Ltd. ("Partnership"), holding that the IRS's administrative adjustments of the Partnership's 2001 and 2002 tax returns were barred by the three-year limitations period in I.R.C. § 6501(a). We have jurisdiction pursuant to I.R.C. § 7482(a)(1). Because we conclude the IRS's adjustments were timely under the six-year limitations period in I.R.C. § 6501(e)(1)(A), we reverse.

**I.**

The Partnership owns a ranch in Mora County, New Mexico. This dispute arises from the Partnership's treatment of various transactions, including sales of parts of the ranch, on its 2001 and 2002 tax returns.[1] Because the underlying transactions have been described in connection with prior litigation, *see Salman*

---

[1] In this context, we use years to denote tax years, not years in which returns are due or filed. Thus, "2001 and 2002 tax returns" refers to returns for the tax years ending December 31, 2001 and December 31, 2002, respectively.

*Ranch Ltd. v. United States* (*Salman Ranch I*), 79 Fed. Cl. 189, 190-92 (2007); *Salman Ranch Ltd. v. United States* (*Salman Ranch II*), 573 F.3d 1362, 1363-65 (Fed. Cir. 2009), we discuss them here only briefly.

In October 1999, the Salman Ranch partners individually entered into short sales involving United States Treasury Notes, generating cash proceeds totaling $10,982,373.[2] *Salman Ranch II*, 573 F.3d at 1364. Five days later, the partners transferred those cash proceeds to the Partnership, along with the corresponding obligation to close the short sales. *Id*. The Partnership satisfied that obligation within weeks, buying replacement bonds for $10,980,866. *Id*.

In November 1999, after the short-sale transactions, the partners caused a technical termination of the Partnership under I.R.C. § 708(b)(1)(B), which allowed them to adjust the basis in the ranch pursuant to I.R.C. §§ 754 and 743(b)(1). *Salman Ranch II*, 573 F.3d at 1364. In making this adjustment, the Partnership increased its basis to reflect proceeds from the short sales, without reducing its basis to account for the offsetting obligation to close the short sales.

---

[2] A "short sale" is "[a] sale of a security that the seller does not own or has not contracted for at the time of the sale, and that the seller must borrow to make delivery." *United States v. Nacchio*, 573 F.3d 1062, 1067 n.6 (10th Cir. 2009) (*quoting Black's Law Dictionary* 1366 (8th ed. 2004)). To close a short sale, the short-seller is obligated to purchase an equivalent number of securities in order to return the borrowed securities. *See Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988). In theory, the short-seller uses proceeds from selling the borrowed securities to meet this obligation, betting that the price of the security will drop in the interim so that he can close the short sale at a profit. *Id.*

*See id.*

In December 1999, the Partnership sold a portion of the ranch for $7,188,588 and granted the purchasers an option to purchase most of the remainder. *Id.* at 1364-65. The buyers exercised that option in 2001. They purchased a second portion of the ranch for an additional $7,260,084, making payments to the Partnership in 2001 and 2002.

The Partnership's 2001 and 2002 tax returns reported basic components of these transactions.[3] The 2001 return listed the $7,260,084 selling price for the 2001 sale of the ranch, a basis of $6,832,230, and other sale expenses of $386,029, for a gross profit of $41,825. The 2001 and 2002 returns also listed installment sale income from the 2001 sale of $11,468 and $30,357, respectively. The partners reported their proportionate shares of the income on their individual returns. Neither the Partnership's return nor the partners' individual returns explained the relationship between the stepped-up basis and the short-sale transactions.

Components of the underlying transactions had been reported on the

---

[3] Partnerships do not pay federal income taxes but are required to file annual informational returns reporting income, gains, losses, deductions, and credits. I.R.C. §§ 701, 6031(a); Treas. Reg. § 301.6231(a)(3)-1(a)(1)(i). The partners are required to report their distributive shares of the partnership's income or loss on their individual tax returns. I.R.C. §§ 701-704. Tax consequences of gross income reported (or misreported) on a Partnership's return are borne by the individual partners. *See id.*; *Salman Ranch II*, 573 F.3d at 1365 n.4; *Randell v. United States*, 64 F.3d 101, 103 (2d Cir. 1995).

Partnership's 1999 tax returns.[4] Those returns listed proceeds from the 1999 sale, a stepped-up basis in the ranch, and the Partnership's election to adjust its basis following the technical termination. *Salman Ranch II*, 573 F.3d at 1364-65. Like the 2001 and 2002 returns at issue in this case, the 1999 return apparently did not explain the connection between the stepped-up basis and the short-sale transactions. *See id.* at 1365.

The IRS eventually determined these transactions amounted to a "Son of BOSS" tax shelter.[5] In particular, it concluded the partners had used the short-sale transactions to artificially inflate the Partnership's tax basis in the ranch by the amount of the offsetting obligation to close the short sales. Without the overstated basis, the IRS calculated the gross (potentially taxable) income on the Partnership's returns would increase by $4,567,949 in the 1999 tax year, by $1,331,281 in the 2001 tax year, and by $3,524,010 in the 2002 tax year.

Accordingly, the IRS issued Notices of Final Partnership Administrative

---

[4] Due to the Partnership's technical termination, two returns were filed for the 1999 tax year. The "old" Partnership filed a return for the period ending November 30, 1999, while the "new" Partnership filed a return for the one-month period of December 1999.

[5] "BOSS" stands for "Bond and Option Sales Strategy." *Burks v. United States*, 633 F.3d 347, 349 n.1 (5th Cir. 2011). "In a Son of BOSS scheme, partners engage in various long and short sale transactions and transfer the resulting obligations to the partnership thereby improperly inflating the basis in the partnership assets. The partners do not reduce the basis by the liabilities assumed by the partnership." *Id.* at 349 (citations omitted); *see also* I.R.S. Notice 2000-44, 2000-2 C.B. 255 (Sept. 5, 2000) (describing prohibited transactions used to artificially inflate basis in assets).

Adjustments (FPAAs) seeking to adjust the Partnership's 1999, 2001 and 2002 tax returns to correct for the alleged overstatement of basis.[6] The FPAAs were issued more than three years, but fewer than six years, after the returns were filed.[7]

The timeliness of the 1999 FPAA was the subject of the prior litigation in the Federal Circuit. *See Salman Ranch II*, 573 F.3d at 1363. The issue in *Salman Ranch II*, as in this case, was whether a three-year or six-year statute of limitations governed the administrative adjustment. Although the IRS normally must issue an FPAA within three years after a return is filed, *see* I.R.C. § 6501(a), the period is extended to six years "[i]f the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return . . . ." I.R.C. § 6501(e)(1)(A).[8] The IRS

---

[6] An FPAA is the mechanism the IRS uses to challenge the reporting of any Partnership item on a Partnership's tax return. It is a predicate to assessing tax on individual partners. *See* I.R.C. §§ 6223(a)(2), 6225(a); *see also Salman Ranch II*, 573 F.3d at 1365.

[7] The 2001 and 2002 FPAAs were issued on March 28, 2008, which was just under six years after the Partnership filed its 2001 return, and just under five years after the Partnership filed its 2002 return. Similarly, the 1999 FPAA was issued on April 10, 2006, just under six years after the Partnership filed its 1999 returns.

[8] At the time of this appeal, § 6501(e) stated in pertinent part:

(e) Substantial omission of items.–Except as otherwise provided in subsection (c)–

　　　　(1) Income taxes.–In the case of any tax imposed by
　　　　subtitle A–

(continued...)

-6-

contended the six-year limitations period applied to the 1999 FPAA because the

Partnership's alleged overstatement of basis was an omission from gross income

sufficient to trigger the extended limitations period. The Partnership claimed it

---

[8](...continued)

> (A) General rule.–*If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return*, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For purposes of this subparagraph–
>
> (i) In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and
>
> (ii) In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

I.R.C. § 6501(e) (2004) (emphasis added). I.R.C. § 6501(e)(1)(A), which originated in the 1954 Tax Code, has since been modified by the Hiring Incentives to Restore Employment Act of 2010, Pub. L. No. 111-147, § 513(a)(1), 124 Stat. 1. The Act reordered § 6501(e)(1)(A) to accommodate the addition of a definition of omitted gross income from assets requiring reporting of foreign financial information. Sections 6501(e)(1)(A)(i) and (e)(1)(A)(ii) were redesignated as §§ 6501(e)(1)(B)(i) and (B)(ii), respectively. For clarity and consistency, we refer to the pre-amendment provisions. Unless otherwise specified, references to § 6501(e)(1)(A) are to the 2004 Tax Code.

was not.  The Court of Federal Claims found in favor of the IRS, ruling that by overstating its basis in the ranch, the Partnership had "omit[ed] from gross income an amount" on its return, thereby triggering the six-year limitations period.  *Salman Ranch I*, 79 Fed. Cl. at 193-94, 204.  The Federal Circuit, however, reversed.  *Salman Ranch II*, 573 F.3d at 1377.

In ruling for the Partnership, the Federal Circuit relied on *Colony v. Commissioner*, 357 U.S. 28 (1958).  *Colony* was a statutory construction case.  Although it was argued and decided after the enactment of the 1954 Tax Code, it involved construction of § 275(c) of the 1939 Tax Code.  That subsection, which was the predecessor to § 6501(e)(1)(A) (1954), allowed the IRS five years, rather than three years, for assessing deficiencies when a taxpayer "omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return."[9]  I.R.C. § 275(c) (1939).  The

_____

[9] In pertinent part, § 275 provided:

§ 275.  Period of limitation upon assessment and collection.  Except as provided in section 276–

(a) General rule.  The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

. . . .

(c) Omission from gross income. *If taxpayer omits from gross income*
(continued...)

taxpayer in *Colony* was a real estate company that sold land.  The company's

1946 and 1947 tax returns included unallowable development costs in calculating

its basis in certain lots.  *Colony*, 357 U.S. at 30.  The question was whether the

IRS had three years or five years to assess the resulting deficiencies on the

company's 1946 and 1947 tax returns.  *Id.* at 31.

In determining whether the phrase "omits from gross income an amount"

included an overstated basis, the Court observed, "[I]t cannot be said that the

language is unambiguous.  In these circumstances, we turn to the legislative

history of § 275(c)."  *Id.* at 33.  Turning to legislative history, the court found

"persuasive indications that Congress merely had in mind failures to report

particular income receipts and accruals, and did not intend the five-year limitation

to apply whenever gross income was understated."  *Id.* at 35.

The Court concluded the purpose of the five-year period in § 275(c) was to

give the IRS extra time to investigate returns in which a taxable item is omitted in

its entirety from a return, not where an item is included in the return but

---

[9](...continued)
*an amount properly includible therein which is in excess of 25 per
centum of the amount of gross income stated in the return*, the tax
may be assessed, or a proceeding in court for the collection of such
tax may be begun without assessment, at any time within 5 years
after the return was filed.

I.R.C. § 275 (1939) (emphasis added).  As can be seen, § 275(c) did not contain
the language found in subparagraphs (i) and (ii) of § 6501(e)(1)(A).

miscalculated.  *Id.* at 35-36.  On this rationale, the Court held that an overstatement in basis was not an omission from income subject to the extended limitations period in § 275(c).  *Id.* at 36.  In so holding, the Court noted its conclusion was "in harmony with the unambiguous language of § 6501(e)(1)(A)." *Id.* at 37.

In the Federal Circuit, the IRS argued *Colony* was inapplicable because its holding was limited to the trade-or-business context of the case before the Court. *See Salman Ranch II*, 573 F.3d at 1371-72.  The IRS based its argument on differences between § 275(c) and its modern version, § 6501(e)(1)(A).  *See id.* Among such differences, the IRS emphasized the addition of subparagraph (i) to § 6501(e)(1)(A).  Subparagraph (i) was added to the former § 275(c) by the 1954 Tax Code.  As noted above, it provides that, "[i]n the case of a trade or business, the term 'gross income' means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services."  I.R.C. § 6501(e)(1)(A)(i); *see also supra* note 8 (discussing the evolution of § 6501(e)). The IRS argued that subparagraph (i) set forth a gross receipts test similar to that adopted in *Colony* and reflected Congress's intent to make this test applicable only "[i]n the case of a trade or business."  *Salman Ranch II*, 573 F.3d at 1371 (internal quotation marks omitted) (alteration in original).  According to the IRS, applying *Colony*'s gross receipts test to every type of sale under § 6501(e)(1)

would render subparagraph (i) superfluous. *Id.* As a consequence, it claimed, "'gross income' in § 6501(e)(A)(1) means gross receipts only in the limited context of trade or business income from the sale of goods or services." *Id.* Therefore, "the general definition of gross income must be broader outside that context and must encompass omissions from income attributable to basis overstatement." *Id.*

Rejecting the IRS's argument that *Colony* applied only in the context of income from a trade or business, the Federal Circuit held that "the alleged overstatement of the basis of [the ranch] by the Partnership did not constitute an omission from gross income under § 6501(e)(1)(A)." *Id.* at 1377. It concluded that "the IRS [was] not entitled to the benefit of the six-year statute of limitations set forth in § 6501(e)(1)(A)" in connection with the Partnership's 1999 tax returns. *Id.*

While the litigation concerning the 1999 FPAA was pending, the Partnership filed the present case in Tax Court, challenging the 2001 and 2002 FPAAs. It sought summary judgment on the ground that the FPAAs were barred by the normal three-year limitations period because, under *Colony* and its progeny, an overstatement of basis can never be considered an "omission from gross income" subject to the six-year period in § 6501(e)(1)(A).[10] The IRS

---

[10] The Partnership made two alternative arguments for why the normal
(continued...)

-11-

opposed the motion.  Consistent with its position in *Salman Ranch II*, 573 F.3d at 1371, it argued *Colony* was inapplicable and the FPAAs were timely under the extended six-year limitations period in § 6501(e)(1)(A).

Like the Federal Circuit, the Tax Court sided with the Partnership. Following its prior decision in *Bakersfield Energy Partners v. Commissioner*, 128 T.C. 207 (2007), *aff'd* 568 F.3d 767 (9th Cir. 2009), the Tax Court applied *Colony* to hold that the FPAAs were barred by the three-year limitations period in § 6501(a).  The Tax Court also cited the Federal Circuit's decision in *Salman Ranch II*, 573 F.3d 1362, which had been issued days before, stating, "[T]he same result has been reached in factual circumstances involving this taxpayer and facts similar, if not identical, to those in this case."  *Salman Ranch, Ltd. v. Comm'r* (*Salman Ranch III*), No. 13677-08 (T.C. Aug. 7, 2009).  This appeal followed.

Before briefing in this appeal, but after the decisions in *Salman Ranch II* and *Salman Ranch III*, the IRS issued temporary regulations setting out its view of § 6501(e)(1)(A).  *See* Temp. Treas. Reg. § 301.6501(e)-1T, 74 Fed. Reg. 49,321 (Sept. 28, 2009).  During the pendency of this appeal, the temporary regulations were reissued, following a notice-and-comment period, as final

---

[10](...continued)
three-year limitations period applied, arguing that it was protected both by the "gross-receipts" provision in I.R.C. § 6501(e)(1)(A)(i) and by the "safe harbor" for adequate disclosure under I.R.C. § 6501(e)(1)(A)(ii). The Tax Court did not reach these issues in its summary judgment decision.  Nor do the parties ask us to address these arguments on appeal.

regulations.  *See* Treas. Reg. § 301.6501(e)-1, 75 Fed. Reg. 78,897 (Dec. 17, 2010).

The regulations were issued in response to the IRS's litigation setbacks in *Salman Ranch II*, 573 F.3d 1362, and similar cases.  The preamble to the temporary regulations expressly disagrees with the decision in *Salman Ranch II*, stating, "The Treasury Department and the Internal Revenue Service disagree . . . that the Supreme Court's reading of the predecessor to section 6501(e) in *Colony* applies to section[] 6501(e)(1)(A) . . . ."  74 Fed. Reg. at 49,321 (citing *Salman Ranch II*, 573 F.3d 1362; *Bakersfield Energy Partners*, 568 F.3d 767).  This language carried over to the preamble of the final regulations.  *See* 75 Fed. Reg. at 78,897.

The regulations provide that, except in the context of income from the sale of goods and services by a trade or business, "an understatement of gross income resulting from an overstatement of unrecovered cost or other basis constitutes an omission from gross income . . . ."  Treas. Reg. § 301.6501(e)-1(a)(1)(iii); *accord* Temp. Treas. Reg. § 301.6501(e)-1T(a)(1)(iii).  In other words, the new regulations set forth the view of *Colony* urged by the IRS in *Salman Ranch II* and *Salman Ranch III*.  *See Grapevine Imports, LTD. v. United States*, 636 F.3d 1368, 1375 (Fed. Cir. 2011).

At issue in this appeal is the effect, if any, to be given to these new treasury

-13-

regulations.[11] The IRS argues the regulations control the outcome of this appeal. The Partnership counters that *Colony* bars us from deferring to the regulations. Relying on collateral estoppel, it argues this appeal is controlled not by the regulations, but by the Federal Circuit's prior decision in *Salman Ranch II*.

## II.

We review decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts . . . tried without a jury." *Estate of True v. Comm'r*, 390 F.3d 1210, 1217 (10th Cir. 2004) (quoting I.R.C. § 7482(a)(1)) (alteration in original). "Because the parties do not dispute the facts, we have before us a purely legal question." *Anderson v. Commerce Constr. Servs., Inc.*, 531 F.3d 1190, 1193 (10th Cir. 2008) (internal quotation marks omitted). Thus, we review the Tax Court's grant of summary judgment de novo. *Scanlon White, Inc. v. Comm'r*, 472 F.3d 1173, 1174 (10th Cir. 2006); *see also Estate of Holl v. Comm'r*, 967 F.2d 1437, 1438 (10th Cir. 1992).

---

[11] Our analysis focuses on the final regulations, which, for our purposes, do not differ materially from the temporary regulations. We do not opine on what effect, if any, the temporary regulations would have had if they had not been superseded by the final regulations during the pendency of this appeal. *Cf. Pelt v. Utah*, 539 F.3d 1271, 1282 (10th Cir. 2008) ("Where a change of law occurs while a case is on appeal, we apply the law in effect at the time of our decision.").

## A.

We consider first whether the new treasury regulations warrant judicial deference. Under the well-established principles of *Chevron*, an agency's construction of a statute it administers is generally owed judicial deference when "the statute is silent or ambiguous" on the precise issue in question and the agency's reading represents a "permissible construction of the statute." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). Although it had previously been unclear, the Supreme Court recently clarified that the principles of *Chevron* "apply with full force in the tax context." *Mayo Found. for Med. Educ. & Research v. United States*, 131 S. Ct. 704, 713 (2011).

*Chevron* analysis entails two steps. First, we ask whether the statute is "silent or ambiguous" on the issue in question such that the agency has room to interpret. *Chevron*, 467 U.S. at 843. In doing so, we use "traditional tools of statutory construction, including the statutory language and legislative history." *Anderson v. Dep't of Labor*, 422 F.3d 1155, 1180 (10th Cir. 2005) (citing *Chevron*, 467 U.S. at 843 n.9). If Congress's intent is then clear on how the question is to be answered, our analysis ends and the congressional intent is given effect. *Chevron*, 467 U.S. at 842-43. If Congress's intent is still ambiguous, we proceed to the second step and ask whether the agency's answer is "based on a permissible construction of the statute." *Id.* at 843. "The court need not conclude the agency construction was the only one it permissibly could have adopted to

-15-

uphold the construction, or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* at 843 n.11. "[I]f the implementing agency's construction is reasonable, *Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecomms. Ass'n v. Brand X*, 545 U.S. 967, 980 (2005). It is to those two steps we now turn.

**1.**

The first step of *Chevron* requires us to ask whether Congress's intent is clear with respect to whether the phrase "omits from gross income an amount" in § 6501(e)(1)(A) includes overstatements of basis arising outside of the trade-or-business context. The Partnership contends this question is resolved by *Colony*, 357 U.S. 28. Under *Colony*, it maintains, the statute's meaning is clear: it does not cover overstatements in basis, regardless of the context in which they occurred. The IRS counters that *Colony* does not control. Consistent with the Federal Circuit's decision in *Grapevine*, 636 F.3d at 1376-79, we conclude that *Colony*, while instructive, does not, and cannot, resolve this question for purposes of *Chevron* step one.

*Colony* long preceded the issuance of the treasury regulations at issue here. As a result, the task the Court faced in *Colony* was different from ours. Its task was to determine the "best interpretation . . . of the statute in light of the

-16-

evidence." *Grapevine*, 636 F.3d at 1377. In doing so, the Court "held the taxpayers' arguments against including overstated basis as an 'omission' [were] stronger than the government's arguments in favor, and interpreted the statute accordingly." *Id.* As the Federal Circuit did in *Grapevine*, we read *Colony* as choosing from competing interpretations of the statute, and we reject the Partnership's contentions to the contrary.

Our responsibility under the first step of *Chevron* is not to decide between competing interpretations of the statute but to determine whether "an omission from gross income," unambiguously does not encompass a taxpayer's overstatement of basis outside the context of a trade or business. *See Chevron*, 467 U.S. at 842-43; *Brand X*, 545 U.S. at 982-83. Employing traditional tools of statutory interpretation, we cannot say that Congress's intent was unambiguous on this precise question. Nothing in *Colony* persuades us otherwise.

The Court in *Colony* recognized as much when it concluded the identical language of the predecessor statute was ambiguous. *See Colony*, 357 U.S. at 33 ("[I]t cannot be said that the language [of the statute] is unambiguous."). While the Partnership is correct that the Court later referred to the updated § 6501(e)(1)(A) (1954) as "unambiguous," *see id.* at 37, we do not read that analysis as extending beyond the trade-or-business context. The taxpayer in *Colony* was a real estate company in the business of selling land, so subparagraph (i)'s gross receipts provision clearly would apply to those circumstances. We are

-17-

not prepared to conclude, based on the *dicta* in *Colony* or otherwise, that the text of the current statute unambiguously resolves Congress's intent with respect to basis overstatements occurring outside the context of a trade or business. Like the Federal Circuit, we thus find *Colony* no bar to our determination that the statute's text, "standing alone, is ambiguous as to the disposition of this issue."[12] *Grapevine*, 636 F.3d at 1378.

Nor does legislative history provide the requisite clarity. Even after reviewing available legislative history preceding the enactment of § 6501(e)(1)(A) and its predecessor statute, we cannot conclude Congress's intent was unambiguous as to the treatment of basis overstatements. The Court in *Colony* reviewed the relevant legislative history related to § 6501(e)(1)(A)'s predecessor. *Colony*, 357 U.S. at 33-35. Although the Court found "persuasive" evidence in the legislative reports that Congress was concerned with situations where a taxpayer failed to report items of income receipts or accruals from its computation of gross income, *id.* at 33, it did not hold there was no other

---

[12] Other courts addressing this issue in the same context as here have concluded otherwise. *See Burks v. United States*, 633 F.3d 347, 360 (5th Cir. 2011) (declining to afford *Chevron* deference because statute was unambiguous); *Home Concrete & Supply, LLC v. United States*, 634 F.3d 249, 256-57 (4th Cir. 2011) (same). *But see Beard v. Comm'r*, 633 F.3d 616, 621-22 (7th Cir. 2011) (holding § 6501(e)(1)(A), with the additions of subparagraphs (i) and (ii), unambiguously differentiates between "gross income" in a trade or business as opposed to "gross income" in all other contexts). We respectfully are not swayed by those contrary conclusions.

reasonable interpretation of the history. Nor, based on our review of the history, do we.

The more recent history of § 6501(e)(1)(A) is no more conclusive. The decisions of the Federal Circuit in *Salman Ranch II* and *Grapevine* are illustrative. In *Salman Ranch II*, the panel concluded that Congress's 1954 Amendments were primarily directed to calculating whether omitted gross income exceeded the 25-percent threshold, not the issue of whether an overstatement in basis counted as an omission. *See Salman Ranch II*, 573 F.3d at 1375-76; *see also Grapevine*, 636 F.3d at 1379 (discussing *Salman Ranch II*). But, as the Federal Circuit's subsequent decision in *Grapevine* makes clear, that legislative history "cannot remove all reasonable dispute about Congress's meaning," 636 F.3d at 1379. Like the court in *Grapevine*, we find the legislative history inconclusive as to the treatment of basis overstatements.

Nor are we persuaded by the Seventh Circuit's determination in *Beard v. Commissioner*, 633 F.3d 616, 620-22 (7th Cir. 2011), that Congress resolved all doubts about the meaning of "omits from gross income" in all instances outside the context of a trade or business, although we agree with much of its discussion. As the court in *Beard* noted,

> it appears that subsection (i) addresses the situation faced by the Court in *Colony* where there is an omission of an actual receipt or accrual in a trade or business situation, while subsection (ii) provides a safe-harbor for improperly completed returns where the return on its face still provides a "clue" to the omitted amount.

-19-

*Id.* at 620. But it is just as clear that Congress was not responding to *Colony* when it added these two provisions because *Colony* was decided in 1958, four years after the statute was amended. While we know now what "omits from gross income" means in § 6501(e)(1)(A) when a trade or business is involved because of subparagraph (i), it is still far from clear what Congress intended it to mean in other contexts.

We are thus persuaded § 6501(e)(1)(A) is ambiguous as to Congress's intent for the treatment of overstatements of basis outside the context of a trade or business. Consistent with the Federal Circuit's analysis in *Grapevine*, we conclude the IRS is "entitled to promulgate its own interpretation of [this statute], and to have that interpretation given deference by courts," so long as it survives the second step of the *Chevron* inquiry. *See Grapevine*, 636 F.3d at 1739.

**2.**

The second step of *Chevron* requires us to determine whether the IRS's construction of "omits from gross income" is "a permissible construction of the statute," *Chevron*, 467 U.S. at 842. Under the new regulation, "an understated amount of gross income resulting from an overstatement of unrecovered cost or other basis constitutes an omission from gross income," except in the trade-or-business context. Treas. Reg. § 301.6501(e)-1(a)(1)(iii) (2010). The IRS justified its regulations as an attempt to clarify the meaning of "omits from gross

income," in response to court decisions that had disagreed with its interpretation. *See* 75 Fed. Reg. at 78,897; *accord* 74 Fed. Reg. at 49,321 (describing same rationale for the temporary regulations).

The Partnership contends the IRS's interpretation is an unreasonable construction of the statute because it contravenes the Supreme Court's decision in *Colony*. We cannot agree. As we explained above, the Court in *Colony* was persuaded that, under the predecessor statute, the longer statute of limitations applied when a taxpayer omitted particular income receipts and accruals in a trade or business, but it did not hold that Congress *unambiguously* intended § 6501(e)(1)(A) to apply only in such situations –  an issue that was not before it. As such, *Colony* does not "unambiguously foreclose" the IRS's interpretation of the statute. *See Brand X*, 545 U.S. at 983.

In such circumstances, "'Congress would expect the [IRS] to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in enacted law, even one about which Congress did not actually have an intent as to a particular result.'" *Hernandez-Carrera v. Carlson*, 547 F.3d 1237, 1246 (10th Cir. 2008) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001)); *see also Mayo Found.*, 131 S. Ct. at 714. Notwithstanding the Court's decision in *Colony*, we must defer to the IRS's construction as long as it is a reasonable interpretation of congressional intent and not "arbitrary, capricious, or manifestly contrary to the statute." *Chevron*, 467 U.S. at 844; *see also Mayo*

*Found.*, 131 S. Ct. at 711; *Hernandez-Carrera*, 547 F.3d at 1246-47.

Several factors lead us to conclude the IRS's interpretation is reasonable and not arbitrary or capricious. First, the IRS's interpretation of "gross income" in § 6501(e)(1)(A) is consistent with the definition of "gross income" used elsewhere in the Tax Code. *See* Treas. Reg. § 301.6501(e)-1(a)(1)(iii) (explaining "the term gross income . . . has the same meaning as provided under section 61(a)"). Section 61 defines "gross income" broadly as "all income from whatever source derived," including "[g]ains derived from dealings in property." I.R.C. § 61(a). Gain from the sale of property is "the excess of the amount realized therefrom over the adjusted basis . . . ." I.R.C. § 1001(a). Because gross income is computed by subtracting basis from the amount realized, it is reasonable for the IRS to have concluded that "an understated amount of gross income resulting from an overstatement of . . . basis constitutes an omission from gross income" under § 6501(e)(1)(A). Treas. Reg. § 301.6501(e)-1(a)(1)(iii).

Second, the IRS's interpretation is consistent with legislative history suggesting Congress enacted the "gross receipts" provision of subparagraph (i) as an exception to the general definition of "gross income" in § 6501(e)(1)(A). *See Beard*, 633 F.3d at 622. Although we are not convinced the IRS's interpretation is the only permissible one or even the one we would have adopted if addressing this question afresh, we are satisfied that it is a "permissible construction" within the mandate of *Chevron*. *See Chevron*, 467 U.S. at 842-843 & n.11.

In resisting this result, the Partnership emphasizes that the regulations were issued in response to litigation and, at least initially, did not undergo notice-and-comment proceedings. Neither factor alters our conclusion. Consistent with the Supreme Court's direction in *Mayo Foundation*, it is "immaterial to our analysis that [the] regulation was prompted by litigation." 131 S. Ct. at 712. (internal quotation marks omitted). While the Partnership is correct that the temporary regulations were issued without notice and comment, "[n]ow that the regulations have issued in final form, these arguments are moot. There can be little doubt that the final regulations . . . are entitled to *Chevron* review and, where appropriate, deference." *Grapevine*, 636 F.3d at 1380 (citing *Mayo Found.*, 131 S. Ct. at 714).

For these reasons, we hold that the IRS's construction of § 6501(e)(1)(A), as implemented in Treas. Reg. § 301.6501(e)-1, is a "permissible construction of the statute." *Chevron*, 467 U.S. at 843. Pursuant to the mandates of *Chevron*, we accord it "controlling weight." *Id.* at 844; *see also Mayo Found.*, 131 S. Ct. at 712-14; *Brand X*, 545 U.S. at 982-83; *accord Hernandez-Carrera*, 547 F.3d at 1247.

## B.

Satisfied the IRS's interpretation of I.R.C. § 6501(e)(1)(A) is entitled to *Chevron* deference, we may dispense quickly with the Partnership's claim that we

-23-

are bound by collateral estoppel to adhere to the Federal Circuit's contrary interpretation in *Salman Ranch II*, 573 F.3d 1362.[13]  Collateral estoppel does not govern our determination here.

Under the doctrine of collateral estoppel, "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153 (1979); *see also Allen v. McCurry*, 449 U.S. 90, 94 (1980).  Collateral estoppel applies in tax cases, but is narrowly construed.  It applies "only when an issue identical to that presented in the second case has been raised and fully adjudicated under identical and inseparable relevant facts in a prior action between the same parties involving a different tax year." *Adolph Coors Co. v. Comm'r*, 519 F.2d 1280, 1283 (10th Cir. 1975) (internal quotation marks omitted).  It also "must be confined to situations where . . . [the] applicable rules remain unchanged." *Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948).

The Partnership contends that because the Federal Circuit has already held for the 1999 tax year "that the alleged overstatement of the basis [of the ranch] by

---

[13] The Partnership raises its collateral estoppel for the first time on appeal. *Salman Ranch II* issued just before the Tax Court's decision in *Salman Ranch III*, and the Tax Court immediately relied on it in its summary decision, without further briefing from the parties.  Thus, there appears to have been no opportunity for the Partnership to raise the collateral estoppel issue any earlier.

the Partnership did not constitute an omission from gross income under

§ 6501(e)(1)(A)," *Salman Ranch II*, 573 F.3d at 1377, we are bound by collateral

estoppel to decide the same. We disagree. While the Partnership is correct that

*Salman Ranch II* involved the same parties, relevant facts, and issue as this case,

it can no longer contend that the "applicable legal rules remain unchanged."

*Sunnen*, 333 U.S. at 600.

As we have held, we must give *Chevron* deference to the new treasury

regulation, and it is readily apparent that the regulation "so change[d] the legal

atmosphere as to render the rule of collateral estoppel inapplicable" in this

appeal. *See Sunnen*, 333 U.S. at 600. Any suggestion by the Partnership that the

regulation cannot be the source of intervening authority is belied by the Court's

decision in *Sunnen*, a tax case. There, the Court made clear that "an interposed

alteration in the pertinent statutory provisions or Treasury regulations" is

sufficient to render collateral estoppel unwarranted. *Id.* at 601. This is so, the

Court said, because the principle of collateral estoppel "is designed to prevent

repetitious lawsuits over matters which have once been decided and which have

remained substantially static, factually and legally. *It is not meant to create

vested rights in decisions that have become obsolete or erroneous with time,

thereby causing inequities among taxpayers."* *Id.* at 599 (emphasis added). Thus,

"where the situation is vitally altered between the time of the first judgment and

the second, the prior determination is not conclusive." *Id.* at 600. We hold that

-25-

the treasury regulation is a new intervening authority which requires us to depart from *Salman Ranch II*.

We are not persuaded otherwise by the Partnership's contention that the new regulation cannot apply in the present case because, by its own terms, it applies only "to taxable years with respect to which the period for assessing tax was open on or after September 24, 2009."[14]  Treas. Reg. § 301.6501(e)-1(e)(1). According to the Partnership, this provision renders the regulation inapplicable in the present case because pursuant to the standard three-year limitations period in I.R.C. § 6501(a), the 2001 and 2002 tax years would have expired before the FPAAs were issued in 2008, and certainly before September 24, 2009.  But this argument presumes the Partnership's alleged overstatement in basis was not an "omission from gross income" for purposes of triggering the extended limitations period in I.R.C. § 6501(e)(1)(A).  This presumption is unsupportable.  As we have

---

[14]  While the Partnership initially framed its argument in terms of the temporary regulation, *see* Aple. Br. at 28-33, there is no dispute that the temporary regulation has since been replaced by the final version.  We note, however, that the differences between the temporary and final regulations are merely semantic, not substantive.  *Compare* Treas. Reg. § 301.6501(e)-1(e)(1) ("[T]his section applies to taxable years with respect to which the period for assessing tax was open on or after September 24, 2009.") *with* Temp. Treas. Reg. § 301.6501(e)-1T(b) ("The rules of this section apply to taxable years with respect to which the applicable period for assessing tax did not expire before September 24, 2009.").  *See generally Carpenter Family Investments, LLC v. Comm'r*, 136 T.C. 17, 2011 WL 1627952, at *4-5 (2011) (discussing semantic distinctions between temporary and final versions, noting they are the "verbal equivalent" of different "side[s] of the same coin").

already explained, prior to the new regulations, the Tax Code was ambiguous as to whether the three-year or six-year limitations period applied in the context of basis overstatements, and neither *Colony* nor *Salman Ranch II* resolved that ambiguity. *See supra* Section II.A. Given this ambiguity, we find no basis for the Partnership's contention that its tax years closed before September 24, 2009.

Moreover, as the court pointed out in *Grapevine*, the preamble to the final regulation makes clear that the regulation applies to taxpayers in the Partnership's position. *See Grapevine*, 636 F.3d at 1382-83. The preamble states:

> [T]he final regulation[] appl[ies] to taxable years with respect to which the six-year period for assessing tax under section . . . 6501(e)(1) was open on or after September 24, 2009. This includes, but is not limited to, all taxable years . . . that *are the subject of any case pending before any court of competent jurisdiction (including the United States Tax Court and Court of Federal Claims) in which a decision had not become final (within the meaning of section 7481).*

75 Fed. Reg. at 78,898 (emphasis added). Because the Partnership filed a petition in Tax Court challenging the IRS's 2001 and 2002 FPAAs, the limitations period was tolled "until the decision of the court becomes final." I.R.C. § 6229(d)(1). Pursuant to § 7481, the Tax Court's decision at issue in this case will not become final until after our court rules and options for review in the Supreme Court have expired. *See* I.R.C. § 7481(a). The straightforward application of these provisions leaves no doubt the Partnership's 2001 and 2002 tax years were open on September 24, 2009 and remain so today.

Nor are we persuaded by the Partnership's related contention that the

-27-

regulation is impermissibly retroactive. The Federal Circuit rejected this precise argument in *Grapevine*, 636 F.3d at 1381-82, and we do as well. The Tax Code expressly provides that the IRS "may prescribe the extent, if any, to which any ruling or regulation, relating to the internal revenue laws, shall be applied without retroactive effect." I.R.C. § 7805(b) (1995).[15] The Supreme Court has expressly endorsed the IRS's authority to apply rules and regulations retroactively under § 7805(b) on an "abuse of discretion" standard. *See Auto. Club of Mich. v. Comm'r*, 353 U.S. 180, 185-87 (1957); *accord Grapevine*, 636 F.3d 1381-82. Like the Federal Circuit, we conclude it was not an abuse of discretion for the IRS to issue regulations that would apply to preceding tax years. *See Grapevine*, 636 F.3d 1381-82. Although some taxpayers whose past returns indicate overstatements in basis may face adjustments when they believed the limitations period had expired, "we cannot say that the burden on those taxpayers is so great as to be an abuse of the Treasury Department's discretion." *Id.* at 1382. We agree with the Federal Circuit that the new regulation may be properly applied to past tax years whose limitations periods remain open as recomputed under the

---

[15] In 1996, Congress amended I.R.C. § 7805(b) to preclude retroactive regulations, except in certain circumstances, such as the prevention of abuse, the correction of procedural defects, and so on. *See* Taxpayer Bill of Rights 2, Pub. L. No. 104-168, 110 Stat. 1452, § 1101(a) (1996). This amended provision applies for regulations related to statutory provisions enacted on or after July 30, 1996. *See* I.R.C. § 1101(b). It has no effect here because § 6501(e)(1)(A) was enacted in 1954, well before July 20, 1996.

new regulation. That the Partnership may have considered its 2001 and 2002 tax years no longer subject to administrative adjustments is no bar to the application of the regulation in this appeal.

## C.

Having concluded the new regulation controls, our final task is to determine whether the Partnership was entitled to summary judgment. It was not. Pursuant to the regulations, its alleged overstatement of basis constitutes an "omission of gross income" for purposes of triggering the six-year limitations period in I.R.C. § 6501(e)(1)(A). Because the 2001 and 2002 FPAAs were issued within that six-year limitations period, we **REVERSE** the Tax Court's summary judgment decision dismissing the FPAAs as barred by the three-year limitations period in I.R.C. § 6501(a).

We **REMAND** to the Tax Court for consideration of the remaining issues raised by the Partnership, which the court previously was not required to address – the applicability of the gross receipts provision, I.R.C. § 6501(e)(1)(A)(i), and the safe harbor for adequate disclosure provisions, I.R.C. § 6501(e)(1)(A)(ii).