# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 5, 2011

Decided June 21, 2011
Reissued August 18, 2011

No. 10-1204

INTERMOUNTAIN INSURANCE SERVICE OF VAIL, LIMITED
LIABILITY COMPANY AND THOMAS A. DAVIES, TAX MATTERS
PARTNER,
APPELLEES

v.

COMMISSIONER OF INTERNAL REVENUE SERVICE,
APPELLANT

———

Appeal from the United States Tax Court

———

*Gilbert S. Rothenberg*, Acting Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellant. With him on the briefs were *Michael J. Haungs* and *Joan I. Oppenheimer*, Attorneys.

*Brian F. Huebsch* argued the cause for appellees. With him on the brief was *Steven R. Anderson*.

*Roger J. Jones*, *Andrew R. Roberson*, and *Kim Marie Boylan* were on the brief for *amicus curiae* Bausch & Lomb Incorporated in support of appellees.

Before: SENTELLE, *Chief Judge*, TATEL, *Circuit Judge*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*:   The Commissioner of Internal Revenue and Intermountain Insurance Service of Vail disagree about Intermountain's 1999 gross income to the tune of approximately $2 million, a disagreement arising from Intermountain's sale of assets and centering primarily on the Commissioner's conclusion that Intermountain inflated its basis in those assets. But deciding whether Intermountain inflated its basis must wait for another day because we must first answer an antecedent question: did the Commissioner wait too long to adjust Intermountain's gross income? Although the Commissioner usually must make such an adjustment within three years, sections 6501(e)(1)(A) and 6229(c)(2) of the Internal Revenue Code give the Commissioner up to six years if the taxpayer (or partnership) "*omits from gross income* an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return." (emphasis added). Because in this case the Commissioner waited nearly six years after Intermountain filed its 1999 tax return, the adjustment was timely only if a basis overstatement can result in an "omission from gross income" for purposes of these two provisions. *Id.* Believing it does not, the Tax Court granted summary judgment to Intermountain. For the reasons set forth in this opinion, we reverse.

## I.

The key tax concept at issue in this case is "basis." Basis refers to a taxpayer's capital stake in an item of property— generally the amount the taxpayer paid to obtain it, as adjusted by various other factors. 26 U.S.C. § 1012. When a

taxpayer sells property, he realizes gain from that sale, and that gain contributes to gross income. *Id.* § 61(a)(3). But the taxpayer's gain from the property sale is not the sale price (or in technical terms, the "amount realized") but rather the sale price minus basis. *Id.* § 1001. Given the role basis plays in calculating gross income, a higher basis translates into a lower gross income. In the real world, of course, people generally prefer a higher gross income. But when dealing with the tax collector, lower gross income means a smaller tax bill. Taxpayers, therefore, prefer a higher basis.

The question this case presents is whether a taxpayer who overstates basis in sold property and therefore understates gross income triggers the extended statute of limitations periods. (For the sake of brevity, we will sometimes refer to the issue as whether a basis overstatement constitutes an omission from gross income under the relevant provisions.) This issue "arises in the context of the now infamous Son of BOSS tax shelter," which shields income from taxation by artificially inflating basis. Appellant's Br. 4 (internal quotation marks and citations omitted). As amicus Bausch & Lomb accurately observes, however, our resolution of this case will "apply equally to *all* taxpayers . . . without regard to the nature of the underlying transaction." Amicus's Br. 7; *see also Wilmington Partners v. Comm'r*, No. 10-4183 (2d Cir. filed Oct. 13, 2010). Conscious of that, and because we agree with the Tax Court that "[t]he details of the transactions are largely irrelevant to the issues we face today," we shall refer to those details only to the extent necessary to explain our disposition of this case. *Intermountain Ins. Serv. of Vail, L.L.C. v. Comm'r*, 134 T.C. 211, 212 (2010) ("*Intermountain II*").

The Commissioner accuses Intermountain Insurance Service of Vail of using a Son of BOSS tax shelter to avoid

taxes on approximately $2 million of income. Intermountain realized that income on August 1, 1999 when it sold its assets for $1,918,844. On its 1999 Tax Return, filed on September 15, 2000, Intermountain reported a loss from this sale of $11,420, an amount it calculated by subtracting its purported basis in the sold assets ($2,061,808) from the sale proceeds ($1,918,844) and the recaptured depreciation ($131,544). Believing Intermountain had artificially inflated its basis in those assets, thus converting a substantial gain into a loss, the IRS mailed Intermountain a Final Partnership Administrative Adjustment (abbreviated FPAA and pronounced "F-Paw" in tax-speak) on September 14, 2006, nearly six years after Intermountain had filed its 1999 Tax Return. The FPAA concluded that certain Intermountain transactions "were a sham, lacked economic substance and . . . had a principal purpose of . . . [reducing] substantially the present value of . . . [Intermountain's] partners' aggregate federal tax liability." *Id.* at 4 (quoting the FPAA) (alterations in the original). As a result, the FPAA adjusted Intermountain's basis to $0.

Intermountain petitioned the Tax Court and moved for summary judgment, arguing that the FPAA was untimely because the IRS mailed it after the expiration of the standard three year statute of limitations provided for in 26 U.S.C. §§ 6501(a) and 6229(a) (2000). Insisting that the FPAA was in fact timely, the Commissioner contended that Intermountain's return triggered the extended six year limitations period, available in the case of any taxpayer, 26 U.S.C. § 6501(e)(1)(A) (2000), or any partnership, 26 U.S.C. § 6229(c)(2) (2000), who "*omits from gross income* an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return." (emphasis added). The alleged omissions to which the Commissioner pointed were almost all overstatements of

basis. The key question for the Tax Court, then, was whether such overstatements qualify as omissions from gross income under sections 6501(e)(1)(A) and 6229(c)(2) and thus trigger the six year limitations period. Contending they do not, Intermountain relied on an earlier tax court decision, *Bakersfield Energy Partners v. Commissioner*, 128 T.C. 207 (2007), *aff'd*, 568 F.3d 767 (9th Cir. 2009), which had applied the Supreme Court's decision in *Colony, Inc. v. Commissioner*, 357 U.S. 28 (1958). In *Colony*, the meaning of which is central to this case, the Supreme Court interpreted "omits from gross income" in section 6501(e)(1)(A)'s predecessor to exclude basis overstatements. *Id.* The Tax Court agreed with Intermountain that *Colony* applies to sections 6501(e)(1)(A) and 6229(c)(2) and that basis overstatements are not "omissions from gross income." *Intermountain Ins. Serv. of Vail, L.L.C.. v. Comm'r*, 98 T.C.M. (CCH) 144, 2009 WL 2762360 (2009) ("*Intermountain I*"). Accordingly, the court granted Intermountain summary judgment. *Id.*

Shortly after the Tax Court's grant of summary judgment—and implicitly contradicting that decision—the Internal Revenue Service issued temporary regulations that interpret the phrase "omits from gross income" in sections 6501(e)(1)(A) and 6229(c)(2) to include basis overstatements outside the trade or business context. 26 C.F.R. §§ 301.6501(e)-1T; 301.6229(c)(2)-1T (2010). The Service reasoned that because I.R.C. section 61(a)'s standard definition of "gross income" includes "gains derived from dealings in property," 26 U.S.C. § 61(a)(3), and because such gains are ordinarily calculated by subtracting basis from the amount realized, *id.* § 1001, "outside the context of a trade or business, any basis overstatement that leads to an understatement of gross income under section 61(a) constitutes an omission from gross income for purposes of

sections 6501(e)(1)(A) and 6229(c)(2)." Definition of Omission from Gross Income, T.D. 9466, 74 Fed. Reg. 49,321, 49,321 (Sept. 28, 2009). As for *Colony*, the Service concluded that it applies only to section 6501(e)(1)(A)'s predecessor, pointing out that Congress had enacted section 6501(e)(1)(A) four years *before* the Supreme Court decided *Colony* and had, at that time, added an amendment (limited to the trade or business context) designed to address the very same issue later addressed in *Colony*. *Id.* Relying on those temporary regulations, the Commissioner moved the Tax Court for reconsideration and to vacate its grant of summary judgment. Denying that motion, the Tax Court found the temporary regulations inapplicable to Intermountain because the standard three year statute of limitations had expired prior to September 24, 2009, the temporary regulations' applicability date. *Intermountain II*, 134 T.C. at 218–20. The Tax Court went on to hold that even assuming the regulations applied, because *Colony* " 'unambiguously forecloses the agency's interpretation' of sections 6229(c)(2) and 6501(e)(1)(A)," that decision "displaces [the Commissioner's] temporary regulations." *Id.* at 224 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005)). For exactly the same reasons, the Tax Court also granted summary judgment to another petitioner, UTAM. *UTAM, Ltd. v. Comm'r*, 98 T.C.M. (CCH) 422, 2009 WL 3739456 (2009).

The Commissioner has appealed the Tax Court decisions in both cases, and because they raise many of the same issues, we scheduled oral argument for both on the same day before the same panel. Although formally resolving only Intermountain's case here, we also address UTAM's arguments about whether a basis overstatement constitutes an omission from gross income. In a separate opinion also

released today, we address issues unique to that case. *UTAM, Ltd. v. Comm'r*, No. 10-1262, (D.C. Cir. June 21, 2011).

## II.

Determining whether basis overstatements constitute omissions from gross income and thus trigger the extended statute of limitations has long provoked debate, the history of which is critical to understanding this case. Congress first established the applicable extended statute of limitations in 1934 when it added section 275(c) to the tax code. *See* Revenue Act of 1934, ch. 277, 48 Stat. 680, 745, § 275(c) (codified at 26 U.S.C. § 275(c) (1934)). Section 275(c) lengthened the standard three year period, 26 U.S.C. § 275(a) (1934), to five years for omissions from gross income, providing as follows:

> Omission from gross income
>
> If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 per centum of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 5 years after the return was filed.

*Id.*

In the 1940s and 1950s, the courts of appeals divided over how to interpret section 275(c). The Sixth Circuit held that a basis overstatement qualifies as an omission from gross income, thus triggering the extended period. *See, e.g.*, *Reis v. Comm'r*, 142 F.2d 900, 902–03 (6th Cir. 1944). The Tax Court interpreted "omits from gross income" similarly. *See,*

*e.g.*, *Estate of Gibbs v. Comm'r*, 21 T.C. 443 (1954); *Am. Liberty Oil Co. v. Comm'r*, 1 T.C. 386 (1942). But the Third Circuit reached the opposite conclusion in *Uptegrove Lumber Co. v. Commissioner*, 204 F.2d 570 (3d Cir. 1953). The taxpayer in that case, a manufacturing corporation, had accurately reported gross sales, but had then mistakenly calculated profits by subtracting from the gross sales figure an inflated amount for the cost of goods sold. *Uptegrove Lumber Co.*, 204 F.2d at 571. Although recognizing "real ambiguity" in the statute, the Third Circuit nonetheless concluded based on section 275(c)'s legislative history that a taxpayer omits an amount from gross income only when the taxpayer fails to report an item of gross sales, not when the taxpayer overstates the cost of that item and thus understates gross income. *Id.* at 571–73.

One year after *Uptegrove Lumber*, in 1954, Congress, apparently responding to the circuit split, added two new subsections to section 275(c) as part of a major recodification of the 1939 tax code. Internal Revenue Code of 1954, 68 Stat. 730, Pub. L. 83-591 (Aug. 16, 1954). In doing so, Congress also renumbered section 275 as section 6501. *Id.* The amended text (as relevant to this case) reads:

> Omission from gross income. . . .
>
> If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. For the purposes of this subparagraph—

    (i)  In the case of a trade or business, the term "gross income" means the total of the amounts received or accrued from the sale of goods or services (if such amounts are required to be shown on the return) prior to diminution by the cost of such sales or services; and

   (ii)  In determining the amount omitted from gross income, there shall not be taken into account any amount which is omitted from gross income stated in the return if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.

26 U.S.C. § 6501(e)(1)(A) (1954). Notably, new subsection (i) substantially tracks *Uptegrove Lumber*'s holding by excluding basis overstatements from the category of omissions from gross income. The amendment, however, used a different mechanism to achieve that result. The Third Circuit had interpreted the phrase "omits from gross income" to exclude basis overstatements, but Congress literally took basis out of section 6501(e)(1)(A)'s equation, redefining "gross income" to mean gross receipts rather than gross receipts minus the cost of goods sold. One other difference is particularly important. Although *Uptegrove Lumber* involved a manufacturing corporation, its reasoning is not limited to that context. By contrast, and of critical significance to this case, subsection (i) applies only "[i]n the case of a trade or

business." Finally, section 6501(e)(1)(A) lengthened the extended statute of limitations from five to six years.

In a letter to the Senate Finance Committee, attorneys supporting the Third Circuit's approach stated their "belie[f] that sub[section] (i) . . . w[as] proposed to reflect the rule of reason announced by cases like *Uptegrove Lumber Company v. Commissioner*." *An Act to Revise the Internal Revenue Laws of the United States: Hearing on H.R. 8300 Before the S. Comm. on Finance*, 83d Cong. 984–85 (1954) (letter from Harry N. Wyatt, D'Ancona, Pflaum, Wyatt & Riskind) (added to the hearing record at the direction of the Committee Chairman, *id.* at 961) ("Wyatt Letter"). Worried that the new provisions would not apply to open tax years governed by the pre-1954 tax code, they asked the Committee to make the new subsections retroactive and to indicate that the amendments merely clarified section 275(c). *Id.* But to no avail—the House and Senate Reports characterized subsections (i) and (ii) as "changes from existing law," and Congress nowhere indicated that section 6501(e)(1)(A) would apply retroactively. H.R. Rep. No. 83-1337, at 503 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4017, 4562; S. Rep. No. 83-1622, at 558 (1954), *reprinted in* 1954 U.S.C.C.A.N. 4621, 5233.

Left unresolved, therefore, was which interpretation—the Third Circuit's or the Sixth Circuit and the Tax Court's—applied to section 275(c) of the 1939 Code. Over the next several years, other circuits embraced the Third Circuit's approach, but the Sixth Circuit stuck with its earlier rule. *Compare, e.g.*, *Davis v. Hightower*, 230 F.2d 549 (5th Cir. 1956) (an overstatement of basis is not an omission from gross income), *with Colony, Inc. v. Comm'r*, 244 F.2d 75 (6th Cir. 1957) (an overstatement of basis is an omission from gross income), *rev'd*, 357 U.S. 28 (1958). In light of this

continued circuit split, the Supreme Court granted certiorari in *Colony*.

Starting with section 275(c)'s text, the Supreme Court explained that "[a]lthough we are inclined to think that the statute on its face lends itself more plausibly to the taxpayer's interpretation"—i.e., that basis overstatements are not omissions from gross income—"it cannot be said that the language is unambiguous." *Colony, Inc.*, 357 U.S. at 33. The Court therefore looked to section 275(c)'s legislative history, where it found "persuasive evidence" that Congress, when adding section 275(c) in 1934, never intended it to apply to basis overstatements. *Id.* Relying on these textual and legislative sources, the Court reasoned that "in enacting s[ection] 275(c) Congress manifested no broader purpose than to give the Commissioner an additional two years to investigate tax returns in cases where . . . the Commissioner is at a special disadvantage in detecting errors [because] the return on its face provides no clue to the existence of the omitted item." *Id.* at 36. Believing that "the Commissioner is at no such disadvantage" when a taxpayer fully reports gross receipts but inflates the costs associated with those receipts, the Court concluded that basis overstatements fell beyond section 275(c)'s scope. *Id.* at 36–37. Finally, the Court buttressed its construction of section 275(c) by comparing it to newly enacted section 6501(e)(1)(A) in the 1954 Code. "[W]ithout doing more than noting the speculative debate between the parties as to whether Congress [in 1954] manifested an intention to clarify" section 275(c)'s meaning, as the taxpayer had argued, "or to change" that meaning, as the Commissioner had argued, the Court observed: "the conclusion we reach is in harmony with the unambiguous language of § 6501(e)(1)(A) of the Internal Revenue Code of 1954." *Id.* at 37.

*Colony* thus closed the first round in the debate over whether a basis overstatement counts as an omission from gross income, that question having been "resolved for the future" (at least in the trade or business context) by Congress when it enacted section 6501(e)(1)(A) and "for earlier taxable years" (seemingly for all taxpayers) by *Colony* itself. *Id.* at 32. Between 1954 and 2010, Congress reenacted section 6501(e)(1)(A) repeatedly and without change. *See, e.g.*, Tax Reform Act of 1986, Pub. L. No. 99-514, 100 Stat. 2085 (1986). In addition, as part of the Tax Equity and Fiscal Responsibility Act of 1982, Congress added section 6229(c)(2) to create an extended statute of limitations period for omissions from gross income appearing (or rather, not appearing) on partnership returns. Pub. L. No. 97-248, § 402, 96 Stat. 324, 659 (1982). That new section tracks section 6501(e)(1)(A)'s language but without subsections (i) or (ii):

> Substantial omission of income.—If any partnership omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in its return, subsection (a) shall be applied by substituting '6 years' for '3 years'.

26 U.S.C. § 6229(c)(2) (1982). At oral argument, Intermountain argued that "this case is not about [section] 6501" but only section 6229 given the Tax Court's observation that where, as here, the Commissioner has adjusted only partnership items, only section 6229(c)(2) applies. Oral Arg. Tr. 15:13‒16:01; *see Intermountain II*, 134 T.C. at 212 n.2. Whether only section 6229(c)(2) applies here, however, is irrelevant, for Intermountain has consistently, both in the Tax Court and on appeal, treated both statutes as having the same meaning outside the trade or business context

and has focused all but one of its arguments on both statutes together or on section 6501(e)(1)(A) alone. *See id.* (explaining that because "the parties [i.e., including Intermountain] refer to the temporary regulations [interpreting sections 6501(e)(1)(A) and 6229(c)(2)] in tandem . . . we will follow the parties' lead and refer to the temporary regulations in tandem"). That is, Intermountain's arguments largely assume that the path to interpreting section 6229(c)(2) passes through section 6501(e)(1)(A). Accordingly, although we shall address Intermountain's sole section 6229(c)(2)-specific argument in due course, *see infra* 24, we treat as forfeited any argument that the two sections might have different meanings outside the trade or business context, focusing our analysis, as have the parties themselves, on the earlier enacted section 6501(e)(1)(A). *See Potter v. District of Columbia*, 558 F.3d 542, 550 (D.C. Cir. 2009) (argument raised for the first time on appeal is forfeited); *Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 108 n.4 (D.C. Cir. 2003) (argument raised for the first time at oral argument is forfeited).

All of this brings us nearly to the present. The latest round in the debate over whether a basis overstatement constitutes an omission from gross income has arisen in the last several years, largely in the context of entities, such as Intermountain, that the Commissioner believes took advantage of Son of BOSS tax shelters. *See, e.g.*, *Bakersfield Energy Partners v. Comm'r*, 568 F.3d 767 (9th Cir. 2009), *aff'g* 128 T.C. 207 (2007); *Salman Ranch Ltd. v. United States*, 573 F.3d 1362 (Fed. Cir. 2009) ("*Salman Ranch I*"). *But see Wilmington Partners v. Comm'r*, No. 10-4183 (case involving whether basis overstatement triggers extended limitations period but no Son of Boss tax shelter allegation). Because all agree that subsection (i)'s redefinition of gross income unequivocally answers this question "in the case of a trade or business," this debate centers entirely on entities,

such as Intermountain (and UTAM), who operate outside that context.

In several such cases, including this one, the Tax Court concluded that Colony controls this latest debate. *See Intermountain I*, 98 T.C.M. (CCH) 144; *see also Bakersfield*, 128 T.C. 207. Although some district courts had held otherwise, by the time the Tax Court granted Intermountain's motion for summary judgment, the Ninth and Federal Circuits had agreed with it. *Compare Burks v. United States*, No. 3:06-cv-1747-N, 2009 WL 2600358 (N.D. Tex. June 13, 2008) (basis overstatement is an omission from gross income), *rev'd*, 633 F.3d 347 (5th Cir. 2011), *and Home Concrete & Supply, L.L.C. v. United States*, 599 F. Supp. 2d 678 (E.D.N.C. 2008) (same), *rev'd*, 634 F.3d 249 (4th Cir. 2011), *with Salman Ranch I*, 573 F.3d 1362 (basis overstatement is not an omission from gross income), and *Bakersfield*, 568 F.3d 767 (9th Cir. 2009) (same).

Disagreeing with those circuits, the Commissioner issued the temporary regulations, described *supra* at 5–6, that interpreted sections 6501(e)(1)(A) and 6229(c)(2) to mean that outside the trade or business context an overstatement of basis constitutes an omission from gross income, thus triggering the extended six year statute of limitations. Simultaneously, the Commissioner issued proposed final regulations identical to the temporary regulations. Notice of Proposed Rulemaking, Definition of Omission from Gross Income, 74 Fed. Reg. 49,354 (Sept. 28, 2009). Approximately a year later, and after soliciting comments, the Commissioner withdrew the temporary regulations and replaced them with largely identical final regulations. *See* 26 C.F.R. §§ 301.6501(e)-1; 301.6229(c)(2)-1; *see also* Definition of Omission from Gross Income, T.D. 9511, 75 Fed. Reg. 78,897 (Dec. 17, 2010). The Commissioner now contends that

these regulations are entitled to *Chevron* deference and so control the question in this case.

Since the Commissioner issued the final regulations, several of our sister circuits have weighed in on the basis overstatement debate. The Fourth and Fifth Circuits have now joined the Ninth and Federal Circuits in holding that *Colony*'s interpretation of section 275(c) applies to sections 6501(e)(1)(A) and 6229(c)(2). *See Home Concrete & Supply, L.L.C. v. United States*, 634 F.3d 249, 255 (4th Cir. 2011); *Burks v. United States*, 633 F.3d 347, 352–59 (5th Cir. 2011). The Fourth and Fifth Circuits also rejected the Commissioner's reliance on the final regulations. *Home Concrete & Supply*, 634 F.3d at 255–58; *Burks*, 633 F.3d at 359–61. By contrast, the Seventh Circuit concluded that *Colony* does not control and that the Commissioner's interpretation of sections 6501(e)(1)(A) and 6229(c)(2) so aligns with Congress's clear intent that the Commissioner had no need even to rely on the regulations. *Beard v. Comm'r*, 633 F.3d 616 (7th Cir. 2011). Finally, the Federal Circuit, which had previously found *Colony* controlling in the absence of IRS regulations, held that because that decision provides only the best, but not the exclusive, construction of the phrase "omits from gross income," the regulations displaced *Colony*. *See Grapevine Imps., Ltd. v. United States*, 636 F.3d 1368 (Fed. Cir. 2011) (applying *Brand X*, 545 U.S. 967); *see also Salman Ranch, Ltd. v. Comm'r*, __ F.3d __, 2011 WL 2120044 (10th Cir. 2011) ("*Salman Ranch II*") (same). In considering this case, we have taken due account of our sister circuits' analyses.

In addition, in 2010 Congress amended sections 6501(e)(1)(A) and 6229(c)(2). *See* Hiring Incentives to Restore Employment Act, Pub. L. No. 111-147, 124 Stat. 71, 112. In this opinion, we interpret the version of those sections

applicable to 1999, the tax year at issue in this case. *See* 26 U.S.C. §§ 6501(e)(1)(A), 6229(c)(2) (2000).

## III.

As the Supreme Court just recently made clear, courts assessing Treasury regulations that interpret the tax code, as we do here, must apply the two-step framework of *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). *See Mayo Found. for Med. Educ. & Research v. United States*, __ U.S. __, 131 S. Ct. 704, 713–14 (2011). Employing "traditional tools of statutory construction," *Chevron*, 467 U.S. at 843 n.9, we begin our *Chevron* analysis by "determin[ing] whether Congress has unambiguously foreclosed the agency's statutory interpretation." *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011) (internal quotation marks omitted). If it has not, then at *Chevron*'s second step, we "ask[] whether the [Commissioner's] rule is a 'reasonable interpretation' of the enacted text." *Mayo Found.*, 131 S. Ct. at 714 (quoting *Chevron*, 467 U.S. at 844).

Although we ordinarily begin a *Chevron* step one inquiry with the statute's text, given the peculiar circumstances of this case, we must first assess *Colony*'s relevance to the question presented. Indeed, Intermountain's argument largely "starts and ends" with *Colony*. Oral Arg. Tr. 15:07–15:08. Because "[a]t new [section] 6501(e)(1)(A) Congress adopted the exact same language the Supreme Court interpreted in *Colony*," Intermountain claims we need do nothing more than apply *Colony*'s holding to this case. Appellees' Br. 39. Intermountain is, of course, correct that in 1954 Congress transferred essentially all of section 275(c)'s text into section 6501(e)(1)(A), and then added two new subsections. Had the meaning of the transferred text been well-established—either because the text itself was unambiguous or because, although

it was ambiguous, the courts and Treasury had consistently interpreted it—then we would agree with Intermountain that this case is easy. We would simply assume Congress intended the text to convey that established pre-reenactment meaning. *See Davis v. United States*, 495 U.S. 472, 482 (1990) (noting that "Congress' reenactment of the statute . . ., using the same language, indicates its apparent satisfaction with the prevailing interpretation of the statute" where the prevailing interpretation had first been offered by the Commissioner of Internal Revenue and then been consistently "relied on" by the courts).

But we face a far different set of circumstances because the language Congress borrowed from section 275(c) was not only understood to be ambiguous, *see, e.g.*, *Uptegrove Lumber*, 204 F.2d at 571 (noting "real ambiguity" in section 275(c)'s text), but had been interpreted one way by the Sixth Circuit and another by the Third. *Compare Reis*, 142 F.2d at 902–03, *with Uptegrove Lumber*, 204 F.2d at 571. Moreover, clearly aware of that debate, Congress added subsection (i) to section 6501(e)(1)(A) to resolve it. *See supra* at 8–10; *see also Colony*, 357 U.S. at 32 (noting that the basis overstatement debate had been "resolved for the future by [section] 6501(e)(1)(A)"); Pet'r's Reply Br. 8, *Colony, Inc.*, 357 U.S. 28 (1958) (No. 306), 1958 WL 91877 (explaining that subsection (i) will "prevent future controversies as to the applicability of the extended limitation period in 'cost of goods sold' cases"); Wyatt Letter at 984–85 (expressing the "belie[f] that sub[section] (i) . . . w[as] proposed to reflect the rule of reason announced by cases like *Uptegrove Lumber Company v. Commissioner*"). As the Seventh Circuit aptly observed, "Congress, when revising [the provision at issue here], was responding not to a unifying decision such as *Colony*, but rather to the confusion throughout the circuits." *Beard*, 633 F.3d at 622. Under these circumstances, we cannot simply assume that the Congress that enacted section

6501(e)(1)(A) understood the phrase "omits from gross income" in the same way as the Congress that originally enacted section 275(c). *Cf. Jama v. Immigration & Customs Enforcement*, 543 U.S. 335, 349 (2005) (refusing to presume that Congress had incorporated purportedly settled interpretations of a statute when reenacting it where "[n]either of the two requirements for congressional ratification [had been] met . . . : Congress did not simply reenact [the statute] without change, nor was the supposed judicial consensus so broad and unquestioned that we must presume Congress knew of and endorsed it"). Nor can we assume that the Supreme Court's 1958 interpretation of that phrase's pre-1954, pre-reenactment meaning necessarily applies post-1954, post-reenactment. Accordingly, before applying *Colony* to section 6501(e)(1)(A), we must determine whether the Supreme Court even considered how Congress *in 1954* understood the text it borrowed from section 275(c).

Significantly, the Court concluded that the one source of continuity between section 275(c) and section 6501(e)(1)(A)—the statutes' essentially identical text—was indeterminate. After all, the Court explained, "it *cannot* be said that the language [of section 275(c)] is unambiguous." *See Colony*, 357 U.S. at 33 (emphasis added). As a result, the Court ultimately relied on a different source, one not shared by section 275(c) and section 6501(e)(1)(A)—namely, section 275(c)'s legislative history. By contrast, the Court considered neither section 6501(e)(1)(A)'s legislative history nor the context in which Congress passed that provision. This was no mere oversight. Colony and the Commissioner both cited these materials and debated whether Congress in 1954 had endorsed Colony's or the Commissioner's interpretation of the relevant text. Pet'r's Br. 23–24, *Colony*, 357 U.S. 28 (1958) (No. 306), 1958 WL 91875; Resp't's Br. 23–24, *Colony*, 357 U.S. 28 (1958) (No. 306), 1958 WL 91876;

19

Pet'r's Reply Br. 6–8, *Colony*, Inc., 357 U.S. 28 (1958) (No. 306), 1958 WL 91877. The Court expressly declined to resolve this debate, however, viewing it as entirely "speculative." *Colony*, 357 U.S. at 37 ("And without doing more than noting the speculative debate between the parties as to whether Congress [in 1954] manifested an intention to clarify or to change the 1939 Code . . . .").

Nor do the Court's few references to section 6501(e)(1)(A) suggest it actually considered that provision's potentially distinctive meaning. Indeed, the Court first mentioned the new statute in order to explain that although the question presented had been "resolved for the future by [section] 6501(e)(1)(A) of the Internal Revenue Code of 1954," it had nonetheless granted certiorari because that question remained unresolved "for earlier taxable years" still governed by section 275(c). *Colony*, 357 U.S. at 32. Rather than signaling that it was interpreting both the pre- and post-1954 tax code, this passage strongly suggests that the Court was focusing on section 275(c), not section 6501(e)(1)(A).

Intermountain's sole argument to the contrary focuses on *Colony*'s only other reference to section 6501(e)(1)(A), in which the Court "observe[d] that the conclusion we reach [about the meaning of section 275(c)] is in harmony with the unambiguous language of [section] 6501(e)(1)(A) of the Internal Revenue Code of 1954." *Id.* at 37. Because the Court cited only section 6501(e)(1)(A), not that section's new subsections, Intermountain insists that the Court must have been referring to section 6501(e)(1)(A)'s principal paragraph—i.e., the one at issue in this appeal. According to Intermountain, then, the "harmony" the Court observed was between its holding and the meaning of the phrase "omits from gross income" in section 6501(e)(1)(A).

The problem with Intermountain's reading is that it makes this passage incomprehensible. In that passage, the Court called section 6501(e)(1)(A)'s text "unambiguous," even though earlier in the opinion it had characterized section 275(c)'s text as ambiguous. *See Colony*, 357 U.S. at 33 ("[I]t *cannot* be said that the language [of section 275(c)] is unambiguous." (emphasis added)). Intermountain would thus have us believe that within the span of just four pages of the U.S. Reports, the Supreme Court illogically described essentially identical text as both ambiguous and unambiguous. We think a far more sensible reading is that the Court was referring only to section 6501(e)(1)(A)'s new subsection (i). After all, subsection (i) is certainly "unambiguous" and, by redefining gross income to mean gross receipts, subsection (i) provides a rule "in harmony" with Colony's holding. *Colony*, 357 U.S. at 37. Indeed, both Colony and the Commissioner made exactly this point to the Court, explaining that "[s]ubsection (i) expressly spells out the construction of Section 275(c) contended for by" Colony. Pet'r's Br. 24, *Colony*, 357 U.S. 28 (1958) (No. 306), 1958 WL 91875; *see also* Pet'r's Reply Br. 8, *Colony*, Inc., 357 U.S. 28 (1958) (No. 306), 1958 WL 91877 (explaining that subsection (i) will "prevent future controversies as to the applicability of the extended limitation period in 'cost of goods sold' cases"); Resp't's Br. 23–24, *Colony*, 357 U.S. 28 (1958) (No. 306), 1958 WL 91876. Of course, there are differences between *Colony*'s holding and subsection (i). Most important for our purposes, subsection (i) applies only to the sale of goods or services in the trade or business context, while nothing in *Colony* suggests that the Court's holding is so limited. But given that Colony described itself as a taxpayer in a trade or business with income from the sale of goods or services—i.e., as falling within subsection (i)'s scope had the subsection applied pre-1954—the Court had no reason to remark on this particular divergence. *See* Comm'r's Reply Br. 6–7, *UTAM,*

*Ltd. v. Comm'r*, No. 10-1262 (D.C. Cir. Feb. 28, 2011) (reviewing how Colony described itself in its briefs to the tax court and the Supreme Court); *see also Salman Ranch II*, __ F.3d __, 2011 WL 2120044, at *6 (explaining that Colony would have fit within the scope of subsection (i)); *Beard*, 633 F.3d at 620 (same).

In sum, to the extent the Court in *Colony* referred to section 6501(e)(1)(A), it did so only to acknowledge that it was interpreting section 275(c) consistently with the new subsection (i) that Congress had added in 1954 to address the same issue prospectively in the trade or business context. Because that observation does not directly control the question presented here, and because it otherwise seems clear to us that the Court in *Colony* dealt *only* with the limited task of interpreting section 275(c) of the 1939 code for cases arising under that code, we believe the Court left unresolved the issue now before us—namely, how to interpret section 6501(e)(1)(A)'s "omits from gross income" language in cases that fall beyond subsection (i)'s scope. It is to that question that we now turn, keeping in mind that we may only reject the Commissioner's interpretation at *Chevron* step one if Congress has unambiguously foreclosed it. *Vill. of Barrington*, 636 F.3d at 659.

Focusing first on section 6501(e)(1)(A)'s relevant text— "omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return"—we are, though not technically bound by *Colony*, *see supra* 16–21, nonetheless inclined to agree with the Supreme Court's judgment that this text, even read in isolation, is susceptible to both the Commissioner's and Intermountain's interpretations. *Colony*, 357 U.S. at 33 ("[I]t cannot be said that the language [of section 275(c)] is unambiguous"). But even if we disagreed

with the Court, once that text is read in the context of the new subsection (i), added in 1954, we think the Commissioner's reading quite possibly better. Remember that subsection (i) expressly redefines "gross income" in the trade or business context such that overstatements of basis cannot themselves trigger the extended statute of limitations. Because Intermountain's interpretation of section 6501(e)(1)(A)'s principal paragraph would accomplish exactly the same result but for all taxpayers, including those engaged in a trade or business, its interpretation renders subsection (i) largely redundant. In effect, Intermountain contends that Congress added a provision designed to exempt basis overstatements even though it believed that the existing language already accomplished exactly that goal. Because we generally presume Congress does not add provisions that simply replicate what the statute already does, *see Stone v. INS*, 514 U.S. 386, 397–98 (1995), we believe it at least plausible that in 1954 Congress understood the "omits from gross income" language to include basis overstatements and added subsection (i) as an exception limited to the trade or business context.

Resisting that conclusion, Intermountain points out that "gross income" plays two different roles in section 6501(e)(1)(A), only one of which its interpretation makes superfluous. Specifically, subsection (i)'s gross income definition affects not only what counts as an "omission from *gross income*," but also whether a taxpayer's total omissions exceed 25 percent "of the amount of *gross income* stated in the return," thus triggering the extended period. 26 U.S.C. § 6501(e)(1)(A) (emphasis added). Because its interpretation of "omits from gross income" in no way encroaches on subsection (i)'s second role, Intermountain contends, any redundancy between that interpretation and subsection (i)'s first role is irrelevant.

Intermountain's point is well taken, but it fails to account fully for subsection (i)'s first role—the one its interpretation admittedly makes irrelevant and that actually led Congress to add subsection (i) in the first place. Recall that Congress added subsection (i) amidst a debate that had divided the courts of appeals and that specifically revolved around whether basis overstatements constituted omissions from gross income. *See supra* 7–10. Given that context, it seems obvious that Congress intended subsection (i) to resolve that debate in the taxpayers' favor, though only in the trade or business context. Indeed, that is exactly how the amendment was contemporaneously understood by the amendment's supporters, by the parties who argued *Colony*, and by the Supreme Court itself. *See supra* 17 (citing *Colony*, 357 U.S. at 32; Pet'r's Reply Br. 8, *Colony*, Inc., 357 U.S. 28 (1958) (No. 306), 1958 WL 91877; Wyatt Letter at 984–85). Thus, although Intermountain is technically correct that its interpretation avoids turning subsection (i) into surplusage, we agree with the Seventh Circuit that it nonetheless "certainly diminishe[s]" the provision's independent significance in a way seemingly at odds with Congress's original intent. *Beard*, 633 F.3d at 622; *see also Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 701 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect." (internal quotation marks omitted)).

Perhaps recognizing this problem, the Ninth Circuit suggested that Congress enacted subsection (i) only to clarify the statute's previous meaning, not to change it. *See Bakersfield*, 568 F.3d at 776. According to this theory, Congress believed the phrase "omits from gross income" already excluded basis overstatements yet passed subsection (i) to make that understanding unmistakably clear.

But this theory is hardly robust enough to satisfy *Chevron* step one's demanding burden. Moreover, section 6501(e)(1)(A)'s House and Senate Committee reports both directly contradict this so-called clarification theory by characterizing subsection (i) as a "change[] from existing law" that "redefine[s]" gross income in the trade or business context. H.R. Rep. No. 83-1337, at 503 (1954), *reprinted in* 1954 U.S.C.C.A.N. at 4562; S. Rep. No. 83-1622, at 558 (1954), *reprinted in* 1954 U.S.C.C.A.N. at 5233. We are thus unpersuaded that Congress intended subsection (i) as a mere clarification.

Finally, Intermountain argues that even if the "omits from gross income" language had an ambiguous meaning when passed in 1954, Congress has since ratified the application of *Colony*'s interpretation to sections 6501(e)(1)(A) and 6229(c)(2). In support, it points out that Congress reenacted section 6501(e)(1)(A) many times and that it enacted section 6229(c)(2)—all *after* the Court in *Colony* definitively interpreted section 275(c)'s corresponding language. This theory, however, collides with our understanding of *Colony* as interpreting only section 275(c). *See supra* 16–21. Given that the Supreme Court limited itself to interpreting section 6501(e)(1)(A)'s predecessor, we have no reason to presume from Congress's silence that it treated that opinion as having authoritatively interpreted section 6501(e)(1)(A) itself. Nor do we see any clear reason to treat section 6229(c)(2) differently, especially since it seems likely that when first enacting that section, Congress intended it to have the same meaning as still-operative section 6501(e)(1)(A) rather than that of long-since defunct section 275(c).

In a post-argument letter filed pursuant to Federal Rule of Appellate Procedure 28(j), Intermountain offers a variation on this reenactment theory based on "the Commissioner's prior position [i.e., before the Son of BOSS controversy] on the

import and effect of the Supreme Court's decision in *Colony*." Appellees' 28(j) Letter 1, Apr. 11, 2011. Intermountain's unsolicited attempt to introduce a new legal theory based on long-available sources neither included in its brief nor even raised at oral argument comes far too late to warrant our attention. *See United States ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, 608 F.3d 871, 878 n.1 (D.C. Cir. 2010) (treating as forfeited arguments raised for the first time in a post-oral argument 28(j) letter unless based on new authority).

In sum, because the Court in *Colony* never purported to interpret section 6501(e)(1)(A); because section 6501(e)(1)(A)'s "omits from gross income" text is at least ambiguous, if not best read to include overstatements of basis; and because neither the section's structure nor its legislative history nor the context in which it was passed nor its reenactment history removes this ambiguity, we conclude that, outside the trade or business context, nothing in section 6501(e)(1)(A) unambiguously forecloses the Commissioner from interpreting "omissions from gross income" as including basis overstatements. We reach the same conclusion with respect to section 6229(c)(2) in light of Intermountain's failure to timely raise any argument that the two provisions should be interpreted differently outside the trade or business context. *See supra* 12–13.

## IV.

Given this conclusion, we would ordinarily next analyze the Commissioner's interpretation of sections 6501(e)(1)(A) and 6229(c)(2) under *Chevron* step two. But Intermountain insists that the Commissioner's interpretation is entitled to no *Chevron* deference at all. Specifically, it argues that the regulations were promulgated in a manner that lacked " 'the fairness and deliberation that should underlie a pronouncement' meriting *Chevron* deference" given that the

"Commissioner[] reactive[ly] issu[ed] . . . the [regulations] immediately following the rejection of his identical litigating position by two Courts of Appeals and the Tax Court." Appellees' Br. 37 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 230 (2001)). Embracing this argument, amicus Bausch & Lomb quotes the Second Circuit's decision in *Chock Full O' Nuts Corp. v. United States*: "[T]he Commissioner may not take advantage of his power to promulgate retroactive regulations during the course of litigation for the purpose of providing himself with a defense based on the presumption of validity accorded to such regulations." 453 F.2d 300, 303 (2d Cir. 1971).

Notwithstanding the rhetorical force of this argument, we agree with the Commissioner that it runs afoul of binding Supreme Court precedent that has, for all practical purposes, superseded *Chock Full O' Nuts*. As a general matter, the Supreme Court has made crystal clear that it is utterly "irrelevant" to the question of whether *Chevron* deference is due "[t]hat it was litigation which disclosed the need for the regulation." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 741 (1996). Indeed, just this Term, while granting *Chevron* deference to another Treasury regulation interpreting the tax code, the Supreme Court explained that "we have found it immaterial to our analysis that a regulation was prompted by litigation." *Mayo Found.*, 131 S. Ct. at 712 (internal quotation marks omitted). Nor, the Court has held, does it matter that the agency promulgating the regulation is a party in the very case that prompted the regulation and that the agency, having lost in the lower courts, now seeks to rely on the regulation to reverse its loss on appeal. Confronting exactly that scenario in *United States v. Morton*, the Court reasoned that even "assuming the promulgation of [the regulation] was a response to this suit, that demonstrates only that the suit brought to light an additional administrative

problem of the type that Congress thought should be addressed by regulation." 467 U.S. 822, 835 n.21 (1984). Indeed, according to the Commissioner, that is exactly the case here where "[f]or almost 50 years, no problems regarding *Colony*'s application of [section] 6501(e)(1)(A) outside the trade-or-business context occurred until 2007, when the Tax Court . . . and the Court of Federal Claims . . . applied *Colony* to block application of the six-year assessment period to understated capital gain resulting from basis overstatements." Appellant's Br. 48 (referring to *Bakersfield*, 128 T.C. 207 and *Grapevine Imports*, 77 Fed. Cl. 505 (2007), *rev'd*, 636 F.3d 1368). Thus bound by exactly on-point Supreme Court precedent, we reject Intermountain's argument.

The partnership in the companion case, UTAM, offers another argument for denying *Chevron* deference to the Commissioner—namely, that "[i]nterpreting a statute of limitations [like the ones here] is outside Treasury's expertise." Appellee UTAM's Br. 34, *UTAM, Ltd.*, No. 10-1262 (D.C. Cir. Feb. 7, 2011). UTAM finds some support for this argument in a Third Circuit decision ruling *Chevron* inapplicable to INS's interpretation of a statute of limitations because "a statute of limitations is a general legal concept with which the judiciary can deal at least as competently as can an executive agency." *Bamidele v. INS*, 99 F.3d 557, 562 (3d Cir. 1996). Expressly rejecting that analysis, the Fourth Circuit recognized that statutes of limitations may be embedded within complex and deeply interconnected regulatory systems, thus requiring "precisely the sort of agency expertise to which *Chevron* requires the courts to defer." *See Asika v. Ashcroft*, 362 F.3d 264, 271 n.8 (4th Cir. 2004). Although this circuit has yet to decide whether or under what circumstances to give *Chevron* deference to agency interpretations of statutes of limitations, we find the Fourth Circuit's reasoning more persuasive than the Third's,

at least in the context of this case. *Cf. Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1210 (D.C. Cir. 1996) (assuming without deciding that *Chevron* deference was owed an Interior regulation interpreting a statute of limitations); *Nat'l Grain & Feed Ass'n v. OSHA*, 845 F.2d 345, 346 (D.C. Cir. 1988) (per curiam) (suggesting that *Chevron* deference would be owed to an OSHA regulation interpreting a statute of limitations were OSHA to later issue one). The interpretive question here is exactly like the one described by the Fourth Circuit, involving, as it does, the Commissioner's complex administrative system for assessing tax deficiencies and his expert interpretation of technical statutory language ("omits from gross income").

Arriving at last at *Chevron* step two, our task is easy. Intermountain's only argument that the Commissioner's interpretation is unreasonable is that it conflicts with *Colony*. But having held that *Colony* applies neither to section 6501(e)(1)(A) nor to section 6229(c)(2), *see supra* 16–21, we see nothing unreasonable in the Commissioner's decision to diverge from *Colony*'s holding.

## V.

Finally, Intermountain and UTAM advance several arguments for why the regulations neither apply to Intermountain (or UTAM) nor were validly promulgated. We consider each in turn.

Reiterating an argument on which the Tax Court relied, Intermountain first contends that the Commissioner's regulations are inapplicable to this case under their own "effective/applicability date" provisions. Those provisions state:

> **Effective/applicability date**. . . . [T]his section applies to taxable years with respect to which the period for assessing tax was open on or after September 24, 2009.

26 C.F.R. §§ 301.6501(e)-1(e)(1); 301.6229(c)(2)-1(b) (2011); *see also* 26 C.F.R. §§ 301.6501(e)-1T(b) (2009); 301.6229(c)(2)-1T(b) (The temporary regulations in effect when the Tax Court ruled included a slightly different version of this provision which, with the changes italicized, stated: "The rules of this section apply to taxable years with respect to which the *applicable* period for assessing tax *did not expire* before September 24, 2009."). In the preamble to the final regulations, the Commissioner interpreted the phrase "the period for assessing tax" to include "all assessment periods Congress has provided, including the six-year period," Appellant's Reply Br. 28, meaning "the final regulations apply to taxable years with respect to which the six-year period for assessing tax under section 6229(c)(2) or 6501(e)(1) was open on or after September 24, 2009," T.D. 9511, 75 Fed. Reg. at 78,898. The preamble, in turn, explains that a taxable year is "open" if, among other things, it is the "subject of any case pending before any court of competent jurisdiction . . . in which a decision had not become final (within the meaning of section 7481)." *Id.* Finally, section 7481 provides, in effect, that a decision is not final "until the last bell has rung in the last court." Appellant's Reply Br. 29. In other words, according to the Commissioner, the regulations apply at least to any taxpayer or partnership whose case was pending in any court at any level on or after September 24, 2009, which all agree includes Intermountain. *See also* IRS Chief Counsel Notice CC-2010-001 (Nov. 23, 2009) (interpreting "the temporary regulations [to] apply to any docketed Tax Court case in which the period of limitations under sections 6229(c)(2) and 6501(e)(1)(A), as

interpreted in the temporary regulations, did not expire with respect to the tax years at issue, before September 24, 2009, and in which no final decision has been entered.").

Intermountain argues that the Commissioner's interpretation essentially requires us to apply the regulations before determining whether they are even applicable—an approach the Tax Court characterized as "irreparably marred by circular, result-driven logic." *Intermountain II*, 134 T.C. at 219. Instead, Intermountain argues, we must first apply the applicability provision based not on the new law set out in the regulations' other provisions, but rather on the law as it existed before the regulations were issued. Because Intermountain believes that *Colony* represents the pre-regulation state of the law, and because under *Colony* only the three year statute of limitations would have applied, Intermountain insists that the only relevant "period for assessing tax" expired, and so closed, before September 24, 2009. According to Intermountain, then, the regulations do not even reach this case.

We grant the highest level of deference to an agency's interpretation of its own regulations, deferring unless the interpretation is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted). Although Intermountain's critique has some force, we think it ultimately insufficient to overcome this extraordinarily deferential standard of review. To begin with, Intermountain's argument depends in significant part on the notion, rejected above, that before the regulations issued, *Colony* applied to sections 6501(e)(1)(A) and 6229(c)(2). But because the pre-regulation state of the law was neither settled nor clear, the Commissioner could reasonably read each of the regulations' provisions, including the applicability provision, in light of the others. Moreover,

we have no doubt that the Commissioner intended from the moment these regulations issued to apply them to cases pending as of September 24, 2009, leaving us confident that this interpretation is no "*post-hoc* rationalization[]." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988) (internal quotation marks omitted). After all, the regulations were prompted by, among other things, this and other similar pending cases; the interpretation was first articulated in a Chief Counsel's Notice shortly after publication of the temporary regulations and while the final regulations' comment period remained open; and the Commissioner announced his definitive interpretation in the preamble to the final regulations. In sum, although the Commissioner created a needlessly complex problem for himself by drafting a fairly cryptic applicability provision, his interpretative solution is neither plainly erroneous nor inconsistent with the regulation. The regulations thus apply to this case.

Intermountain next contends that applying the regulations under the circumstances of this case would make them impermissibly retroactive. This is so, Intermountain says, because the regulations change settled law—namely, *Colony*'s interpretation of sections 6501(e)(1)(A) and 6229(c)(2)—thus disrupting the expectations of taxpayers or partnerships who filed returns for tax years prior to the regulations' effective date. We disagree. Because *Colony* never applied to section 6501(e)(1)(A) or section 6229(c)(2), *see supra* 16–21, there was no *settled* law for the regulations to change. Given our treatment of *Colony*, the most Intermountain might have argued is that the regulations raise a different sort of retroactivity issue, i.e., that they bring clarity to an area of the law that had been ambiguous during the tax year at issue in this case. But because neither Intermountain nor UTAM makes this particular argument, we decline to consider it. *United States v. Reeves*, 586 F.3d 20, 26

(D.C. Cir. 2009) (declining to address an argument not argued on appeal).

Focusing next on the regulatory process, UTAM and amicus Bausch & Lomb urge us not to apply the final regulations because, they say, the Commissioner failed to keep an "open mind" during the notice-and-comment period. Ordinarily, we evaluate an agency's so-called open mindedness only when it issues final regulations without the requisite comment period and then tries to cure that Administrative Procedure Act violation by holding a post-promulgation comment period. *See, e.g., Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 28 F.3d 1288, 1291–93 (D.C. Cir. 1994). Here, the Commissioner simultaneously issued immediately effective temporary regulations and a notice of proposed rulemaking for identical final regulations and then held a 90-day comment period before finalizing the regulations. According to UTAM and Bausch & Lomb, that procedure, although typical of the Commissioner's practice, violates the Administrative Procedure Act, thus requiring an open-mindedness inquiry.

Even assuming the applicability of this framework, however, we believe the final regulations were validly promulgated. UTAM and Bausch & Lomb criticize the Commissioner for the preamble's "silen[ce] regarding the numerous arguments" advanced in voluminous related litigation, Amicus's Br. 14–15, and for "ma[king] only immaterial changes" in response to those comments, Appellee UTAM's Br. 55. But an open-mindedness review focuses not on whether the Commissioner responded to *litigants*, but rather on whether he has "afforded the *comments* [received during the comment period] particularly searching consideration." *Advocates for Highway & Auto Safety*, 28 F.3d at 1292 (emphasis added) (internal quotation marks

omitted). Moreover, "[w]hile changes and revision are indicative of an open mind, an agency's failure to make any does not mean its mind is closed." *Id.* Here, the Commissioner received only one comment, which characterized the proposed regulations as having "retroactive effect 'in that taxable years which had closed are now reopened.'" T.D. 9511, 75 Fed. Reg. at 78,898 (quoting comment received). Responding to this comment in the preamble to the final regulations, the Commissioner "disagreed with the characterization of the regulations as retroactive" and noted that "[t]he final regulations have been clarified to emphasize that they only apply to open tax years, and do not reopen closed tax years." *Id.* This last response appears to mean that although the regulations apply to pending cases such as this one, they have no applicability to cases such as *Bakersfield Energy Partners*, 568 F.3d 767, in which the Commissioner lost and declined to appeal. The Commissioner also responded to the commenter's reliance on the 1996 amendments to section 7805(b), which prohibit the Commissioner from making certain regulations retroactive. Specifically, the Commissioner explained that those amendments have no applicability to the statutory provisions interpreted by the regulations and, in any event, that "these regulations are not retroactive." T.D. 9511, 75 Fed. Reg. at 78,898. Given the Commissioner's "searching consideration" of the comment, we have no doubt that he kept the requisite open mind. *Advocates for Highway & Auto Safety*, 28 F.3d at 1292 (internal quotation marks omitted).

## VI.

In sum, the Commissioner's regulations were validly promulgated, apply to this case, qualify for *Chevron* deference, and pass muster under the traditional *Chevron* two-step framework. Because the Tax Court concluded otherwise and failed to apply the Commissioner's interpretation of

sections 6501(e)(1)(A) and 6229(c)(2), we reverse that court's grant of summary judgment. In addition, we remand for the Tax Court to consider Intermountain's alternative argument, made in the tax court but unaddressed there, that Intermountain avoided triggering the extended statute of limitations by "*adequately disclos[ing]* to the IRS the basis amount it applied in connection with the transaction at issue." Appellees' Br. 57 (emphasis added) (relying on section 6501(e)(1)(A)(ii)).

*So ordered.*